**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| **CODY LACY, ET AL,** | * | Case No. 3:11-cv-52 |
| *Plaintiffs,* | * | Judge Walter Herbert Rice |
| v. | * | |
| **REDDY ELECTRIC CO., ET AL.,** | * | **PLAINTIFFS' MOTION FOR** |
| | | **PARTIAL SUMMARY JUDGMENT** |
| *Defendants.* | * | |

Under Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs request partial summary judgment on fifteen legal and factual issues.  Assuming summary judgment is granted on each such issue, the remaining issues to be tried in the case include:

1. The number of hours that Defendants must pay back wages to each Plaintiff related to the Defendants' unlawful time-rounding policy;

2. The total number of hours Defendants must pay back wages to each Plaintiff related to each Plaintiff's operation of a Company vehicle while transporting employees, tools, equipment or materials between Reddy Electric's shop and various job sites;

3. The total number of hours Defendants must pay back wages to each Plaintiff related to each Plaintiff pursuant to the continuous workday rule, which includes but is not limited to, hours spent loading and unloading Company vehicles, being driven between Reddy Electric's shop and various job sites, and any other work performed for the benefit of the Company prior to, or after, clocking-in or clocking-out of work on any given work day;

4. The total amount of back wages and damages—including R.C. 4113.15 damages for non-payment of wages promptly and the unauthorized deduction from Lacy's final paycheck—that Defendants must pay each Plaintiff;

5. The amount of costs, including reasonable attorneys' fees, to which Plaintiffs are entitled; and

6. Any other issues necessary to fully adjudicate all issues raised in the above-captioned matter.

1

A table of contents, table of authorities, summary of argument, and memorandum in support follows.

Respectfully submitted,

MANGANO LAW OFFICES CO., L.P.A.

_____s/Joseph J. Guarino III_____
Basil W. Mangano (0066827)
*Joseph J. Guarino III (0079260)
2245 Warrensville Center Rd., Suite 213
Cleveland, Ohio 44118
T: (216) 397-5844
F: (216) 397-5845
bmangano@bmanganolaw.com
jguarino@bmanganolaw.com

And

Ryan K. Hymore (0080750)
10901 Reed Hartman Hwy., Ste. 207
Cincinnati, Ohio 45242
T: (513) 255-5888
F: (216) 397-5845
rkhymore@bmanganolaw.com

*Trial Attorney for Plaintiff

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................ 3

TABLE OF AUTHORITIES ..................................................................................................... 5

SUMMARY OF ARGUMENTS ................................................................................................ 8

MEMORANDUM IN SUPPORT ............................................................................................ 13

   I.    INTRODUCTION & FACTS ...................................................................................... 13

      A.    Background Establishing Applicability of the Fair Labor Standards Act. ............. 13

      B.    Cody Lacy's Employment ................................................................................. 14

      C.    Kyle Syx's Employment ................................................................................... 18

         1.   The Arcanum Project .................................................................................. 19

         2.   The Talawanda Project ............................................................................... 21

      D.    The Employer's Rounding Policy .................................................................... 23

      E.    Lacy's Pre-Suit Employment Records Request ................................................ 26

   II.    LAW AND ARGUMENT ........................................................................................ 27

      A.    Summary Judgment Standard ......................................................................... 27

      B.    General Requirements of the Fair Labor Standards Act ................................... 28

         1.   The Portal-to-Portal Act Exemptions Are Exceptionally Narrow, and Do Not Alter the Concept of Compensable Work Prior To or After the Actually Paid Workday ................................................................................................. 30

         2.   An Employer's Obligation to Maintain Records and the Legal Presumption Created in the Event the Employer Fails to Adhere to Those Obligations. ............ 35

      C.    Plaintiffs Lacy and Syx Are "Employees" Within the Meaning of the Fair Labor Standards Act. ............................................................................................... 37

      D.    Defendants Reddy Electric and Jeffrey Eldridge Are Both "Employers" Within the Meaning of the Fair Labor Standards Act and Are Subject to FLSA's Requirements .................................................................................................. 38

E.     Defendants Utilize an Unlawful Time-Rounding Policy. .................................. 40

   1.     Defendant's Time-Rounding Policy Is Unlawful on Its Face. ........................................ 42

   2.     Even if Defendant's Time-Rounding Policy Is Not Unlawful on Its Face, Its Operation Renders It Unlawful Because Over a Period of Time, The Policy Does Not Pay Plaintiffs for All Hours Worked. ............................................................... 44

   3.     There Is No *De Minimis* Exception to Excuse Non-Payment in the Context of Unpaid Time Resulting from Unlawful Rounding Policies. ........................................... 46

F.     Defendants Refused to Include Plaintiffs' Compensable Work Spent Driving and/or Riding in Company Vehicles for Purposes of Determining Plaintiffs' Hours Worked in Any Given Work Week, Which Results in Underpayments Under the Fair Labor Standards Act. ......................................................................................................... 47

   1.     Plaintiffs Are Entitled to Compensation for Time Spent Driving Company Vehicles to or from Project Sites While Transporting Other Company Employees, Company Equipment, Company Tools, or Company Materials. .................................. 48

   2.     Plaintiffs Are Entitled to Compensation for Time Each Spent Riding in Company Vehicles to or from Project Sites When Such Time Is Compensable Under the Continuous Workday Rule. .............................................................................................. 53

      a.     The Time Plaintiffs Spent Loading or Unloading Company Vehicles Prior to or After Riding In Company Vehicles Triggers Application of the Continuous Workday Rule, Making the Ride in the Company Vehicle Compensable. ............ 54

      b.     The Time Plaintiffs Spent Loading/Unloading Company Vehicles Prior to and/or After Riding in Company Vehicles Was Not *De Minimis* ........................... 58

G.     Upon the Finding that Back Pay Is Owed to Plaintiffs, Plaintiffs Are Entitled to Liquidated (or Treble) Damages. ......................................................................... 60

H.     Upon Finding a Violation, an Award of Costs and Attorneys' Fees Is Mandatory. .. 62

I.     Defendants Failed to Timely Respond to Plaintiff Lacy's Request for His Employment Records under the Ohio Constitution. ........................................... 63

III.     CONCLUSION ........................................................................................................ 67

CERTIFICATE OF SERVICE ........................................................................................... 69

## TABLE OF AUTHORITIES

**Cases**

*Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 U.S. Dist. LEXIS 68942, at *11 (E.D. Wis. Sept. 11, 2008) .................................................................................................................................. 41

*Alonzo v. Maximus, Inc.*, F. Supp. 2d, 2011 U.S. Dist. LEXIS 150265, 2011 WL 6396444, at *4 (C.D. Cal. Dec. 5, 2011) .......................................................................................................... 42

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). ............................................... 28

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) ......................................... 29, 30, 35, 58

*Armour & Co. v. Wantock*, 323 U.S. 126 (1944)................................................................... 29

*Austin v. Amazon.com, Inc.*, No. C09-1679JLR, 2010 U.S. Dist. LEXIS 45623, 2010 WL 1875811, at *3 (W.D. Wash. May 10, 2010)............................................................................ 42

*Baker v. Barnard Constr. Co.*, 146 F.3d 1214 (10th Cir. 1998) .......................................... 48

*Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468-69 (5th Cir. 1979) .................... 61

*Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) ............................... 28

*Breen v. Concrete By Wagner, Inc.*, No. 98 C 3611, 1999 U.S. Dist. LEXIS 17401, at *37 (N.D. Ill. Nov. 4, 1999) ...................................................................................................................... 56

*Brock v. City of Cincinnati*, 236 F.3d 793, 803 (6th Cir. 2001) .......................................... 32

*Bueno v. Mattner*, 829 F.2d 1380, 1387 (6th Cir. 1987), cert. denied, 486 U.S. 1022 (1988) 29

*Chao v. Self Pride, Inc.*, No. Civ. RDB 03-3409, 2005 U.S. Dist. LEXIS 11653, 2005 WL 1400740, at *6 (D. Md. June 14, 2005)...................................................................................... 42

*Contini v. United Trophy Mfg.*, No. 6:06-cv-432-Orl-18UAM, 2007 U.S. Dist. LEXIS 42510, 2007 WL 1696030, at *3 (M.D. Fla. June 12, 2007)............................................................... 41

*Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991) ....................... 38, 39

*Dole v. Enduro Plumbing, Inc.*, No. 88-7041-RMT (KX), 1990 U.S. Dist. LEXIS 20135 (C.D. Cal. Oct. 16, 1990) .............................................................................................................. 48, 49, 55

*Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983) ............................................. 38, 39

*Duchon v. Cajon Co.*, No. 86-4009, 1988 U.S. App. LEXIS 2167, at * 10 (6th Cir. Feb. 22, 1988) ............................................................................................................................................... 32

*Dunlop v. City Elec., Inc.*, 527 F.2d 394, 398-99 (5th Cir. 1976).................................... 31, 55

*East v. Bullock's, Inc.*, 34 F. Supp. 2d 1176, 1184 (D. Ariz. 1998)..................................... 41

*Eddings v. Health Net, Inc.*, No. CV 10-1744-JST, 2012 U.S. Dist. LEXIS 51158, at *10-13 (C.D. Cal. Mar. 23, 2012) .................................................................................... 41, 42, 46, 47

*Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 849 (6th Cir. 2002)..................... 60

*Eyles v. Uline, Inc.*, No. 4:08-CV-577-A, 2009 WL 2868447, at *4 (N.D. Tex. Sept. 4, 2009) .. 42

*Falk v. Brennan*, 414 U.S. 190, 195 (1973) ........................................................................ 38

*Farmer v. Ottawa County*, No. 98-2321, 2000 U.S. App. LEXIS 7224, at *19-20 (6th Cir. Apr. 13, 2000)............................................................................................................................. 62

*Fegley v. Higgins*, 19 F.3d 1126, 1134 (6th Cir. 1994) ...................................................... 62

*Hellmers v. Town of Vestal, N.Y.*, 969 F. Supp. 837 (N.D.N.Y. 1997)................................ 35

*Herman v. Palo Group Foster Home*, 183 F.3d 468, 472 (6th Cir. 1999) ................. 31, 36, 51, 56

*Herman v. Rich Kramer Construction, Inc.*, No. 97-4308WMS, 1998 U.S. App. LEXIS 23329 (8th Cir. Mo. Sept. 21, 1998) ...................................................................................... 49, 52, 55

*Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)...................................... 39

*Hodge v. Lear Siegler Services, Inc.* No. CV 06-263-MHW, 2008 U.S. Dist. LEXIS 45128 (D. Idaho June 9, 2008) .................................................................................................. 49, 50

*Hodgson v. Frisch's Dixie, Inc.*, No. 6641, 1971 U.S. Dist. LEXIS 12029, at *11 (W.D. Ky. Aug. 16, 1971).................................................................................................................. 55

*IBP v. Alvarez*, 546 U.S. 21 (2005)................................................................................. passim

*Jerzak v. City of South Bend*, 996 F. Supp. 840 (N.D. Ind. 1998)...................................... 35

*Knight v. Allstar Bldg. Materials, Inc.*, No. 6:08-cv-457-Orl-22DAB, 2009 U.S. Dist. LEXIS 107247 (M.D. Fla. Sept. 30, 2009).................................................................................. 52

*Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706 (2d Cir. 2001)................... 34

*Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2004 U.S. Dist. LEXIS 16288, at **21-22 (N.D. Ill. Aug. 18, 2004)............................................................................... 55

*Lindow v. United States*, 738 F.2d 1057 (9th Cir.1984). ....................................................... 58

*Lopez v. Silverman,* 14 F. Supp.2d 405, 411 (S.D.N.Y. 1998) ............................................. 38

*Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004) ..................................... 28

*Martin v. Indiana Michigan Power Company*, 381 F.3d 574, 585 (6th Cir. 2004) ..................... 60

*Mitchell v. King Packing Co.*, 350 U.S. 260, 261-63 (1956) ................................................. 31

*O'Brien v. Encotech Constr.*, No. 00-CV-1133, 2004 U.S. Dist. LEXIS 4696, at *17 (N.D. Ill. Mar. 23, 2004)................................................................................................................. 55, 56

*Pandey v. Rascal Unit, Ltd.*, No. 2:09-cv-550, 2010 U.S. Dist. LEXIS 54348 (S.D. Ohio Apr. 30, 2010).................................................................................................................. 64

*Pandey v. Rascal Unit, Ltd.*, No. 2:09-cv-550, 2010 U.S. Dist. LEXIS 76687, at *3-4 (S.D. Ohio July 19, 2010)........................................................................................................... 64, 66

*Perez v. Mountaire Farms*, 601 F. Supp. 2d 670, 683-84 (D. Md. 2009) ............................... 59

*Preston v. Settle Down Enterprises, Inc.*, 90 F. Supp. 2d 1267 (N.D. Ga. 2000) ..................... 48

*Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 (10th Cir. 1994)...................................................... 59

*Reich v. Monfort, Inc.*, 144 F.3d 1329 (10th Cir.1998)....................................................... 58

*Reich v. New York City Transit Authority*, 45 F.3d 646, 649-50 (2d Cir. 1995);...................... 58

*Reich v. S. New England Telecom. Corp.*, 121 F.3d 58, 70 n.3 (2d Cir. 1997)....................... 37

*Ross v. Wolf Fire Prot., Inc.*, 799 F. Supp. 2d 518 (D. Md. 2011)..................................... 54, 59

*Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804, 820 (N.D. Ill. 2010) ................................. 41

*Salyer v. Ohio Bureau of Workers' Comp.*, 83 F.3d 784, 786 (6th Cir. 1996) ......................... 31

*Secretary v. E.R. Field, Inc.*, 495 F.2d 749, 751 (1st Cir. 1974) .......................................... 49

*Sepulveda v. Allen Family Foods, Inc.*, 591 F.3d 209, 213 (4th Cir. 2009) ........................... 29

*Singh v. City of New York*, 524 F.3d 361, 371 (2d Cir. 2008)............................................... 59

*Sloan v. Renzenberger, Inc.*, No. 10-2508-CM-JPO, 2011 U.S. Dist. LEXIS 41018, at *3 (D. Kan. Apr. 15, 2011)................................................................................................................. 41

*Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274 (10th Cir. 2006) ..................................... 53

*Solis v. Min Fang Yang*, 345 F.Appx. 35, 39 (6th Cir. 2009)................................................. 61

*Steiner v. Mitchell*, 350 U.S. 247, 256 (1956)..........................................................31, 33, 34

*Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 563 (1931) ........................ 35

*Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)............. 28, 29

*Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 295 (1985) ..................... 37

*Tum v. Barber Foods*, 331 F.3d 1, 4-5 (2003) .................................................................. 33

*U.S. Dep't of Labor v. Cole Enters.*, 62 F.3d 775, 779 (6th Cir. 1995)................................. 36

*U.S. v. Ewald Iron Co.*, 67 F. Supp. 67 (W.D. Ky. 1946) ................................................... 35

*United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Ass'n, Local 307 v. G & M Roofing and Sheet Metal Co. Inc.*, 732 F.2d 495, 501 (6th Cir. 1984). ........................... 62

*Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947) ................................................ 37

*Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986) ................................. 61

*Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984) ..................................... 61

## Statutes

29 U.S.C. § 203 ............................................................................................................... 38, 39

29 U.S.C. § 211 ................................................................................................................. 36

29 U.S.C. § 216 ............................................................................................................. 61, 63

29 U.S.C. § 254 ............................................................................................................. 32, 48

29 U.S.C. § 260 ................................................................................................................. 62

29 U.S.C. §§ 206(a)(1), 207(a)(1). ..................................................................................... 30

29 U.S.C. §§ 251-262 ..................................................................................................... 31, 49

29 U.S.C. 216 ..................................................................................................................... 61

29 U.S.C. 254 ..................................................................................................................... 34

R.C. 4111.14 ................................................................................................................. 64, 66

## Rules

Fed. R. Civ. P. 56 .............................................................................................................. 23

## Regulations

29 C.F.R. § 516 ................................................................................................................. 36

29 C.F.R. § 516.2 .............................................................................................................. 36

29 C.F.R. § 785.11 ............................................................................................................ 30

29 C.F.R. § 785.12 ............................................................................................................ 30

29 C.F.R. § 785.13 ............................................................................................................ 30

29 C.F.R. § 785.24 ............................................................................................................ 32

29 C.F.R. § 785.35 ............................................................................................................ 47

29 C.F.R. § 785.38 ........................................................................................................ 48, 55

29 C.F.R. § 785.48 ........................................................................................................ 40, 41

29 C.F.R. § 785.6 .............................................................................................................. 32

29 C.F.R. § 785.7 .............................................................................................................. 32

29 C.F.R. § 790.2(a) .......................................................................................................... 31

29 C.F.R. § 790.6 .......................................................................................................... 30, 54

29 C.F.R. § 790.7 .............................................................................................................. 55

29 C.F.R. § 790.8 .............................................................................................................. 32

## Constitutional Provisions

Article II, Section 34a of Ohio's Constitution .............................................................. passim

## SUMMARY OF ARGUMENTS

This brief addresses several factual scenarios, each of which results in a violation of the Fair Labor Standards Act or the Minimum Wage Amendment to Ohio's Constitution. After addressing the facts—most of which are undisputed—the Memorandum in Support provides a background on the relevant law pertaining to the FLSA's obligations, 29 U.S.C. §§ 206(a)(1), 207(a)(1); its purpose, *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999); *Tenn. Coal. Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944); the definitions of "work" and "workweek," *IBP v. Alvarez*, 546 U.S. 21 (2005); and that "[w]ork not requested but suffered or permitted is work time." 29 C.F.R. §§ 785.11, .12, 13.

The Memorandum also explains the actual impact of the Portal-to-Portal Act on the FLSA, including the fact that it does not alter the FLSA's definition of "work." *Herman v. Palo Group Foster Home*, 183 F.3d 468, 472 (6th Cir. 1999); 29 U.S.C. § 254(a). It then demonstrates that compensable time is time that is an 'integral and indispensable part of the principal activities.'" *Alvarez*, 546 U.S. at 29-30. Employees may have more than one principal activity, and such activities are not limited to the predominant activity. 29 C.F.R. § 790.8(a). As such, activities "performed either before or after the regular work shift" remain compensable "if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1)." *Alvarez*, 546 U.S. at 29-30.

Next, the Memorandum generally addresses employers' record generation and maintenance obligations under the FLSA and the judicially crafted remedy for failure to create and maintain those documents in violation of the FLSA. 29 U.S.C. § 211(c); 29 U.S.C. § 215(a)(5). In situations where, as here, an employer fails to keep accurate records of all

time worked by its employees, courts have crafted a burden-shifting remedy to redress those violations and ease an employees' method of proof related to hours worked that should have been otherwise documented. *Palo Group Foster Home*, 183 F.3d at 472; *U.S. Dep't of Labor v. Cole Enters.*, 62 F.3d 775, 779 (6th Cir. 1995); *Reich v. S. New England Telecom. Corp.*, 121 F.3d 58, 70 n.3 (2d Cir. 1997).

After that, because Defendants refused to stipulate to these preliminary matters through the pleadings or requests for admission, the Memorandum next addresses the issues related to the applicability of the FLSA to this case. The Memorandum establishes that each of the Plaintiffs in this case is an "employee" within the meaning of the FLSA. 29 U.S.C. § 203; *Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 295 (1985). Then, it establishes that both Reddy Electric and Jeffrey Eldridge are "employers" within the meaning of the FLSA. 29 U.S.C. § 203(a); 29 U.S.C. 203(d); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991).

With that background in place, the Memorandum moves into the specific, compensation scenarios at issue in this case. The first scenario relates to the Defendants utilization of an unlawful time-rounding policy that takes an employee's "clocked-in" time for purposes of payroll and "rounds" it to nearest *half* hour. Under 29 C.F.R. § 785.48(b), a time-rounding policy is only lawful where it rounds to either the nearest five minutes, one-tenth of an hour, or a maximum of the nearest quarter of an hour and where, importantly, it averages out so employees are actually paid for all hours they work.

Discussion of the time-rounding policy appears in Part E, which contains three subsections 1, 2 and 3. The first subsection addresses the *per se* illegality of the Defendants' thirty-minute time-rounding policy under the applicable rules and case law

including 29 C.F.R. § 785.48(b); *Eddings v. Health Net, Inc.,* No. CV 10-1744-JST, 2012 U.S. Dist. LEXIS 51158, at *10-13 (C.D. Cal. Mar. 23, 2012); and *Sloan v. Renzenberger, Inc.*, No. 10-2508-CM-JPO, 2011 U.S. Dist. LEXIS 41018, at *3 (D. Kan. Apr. 15, 2011)).  The second subsection addresses the issue that Defendants' time-rounding policy, even if not *per se* unlawful, still violates the FLSA because it results in the systematic under-compensation of employees.  29 C.F.R. § 785.48(b); *Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804, 820 (N.D. Ill. 2010); *Austin v. Amazon.com, Inc.*, No. C09-1679JLR, 2010 U.S. Dist. LEXIS 45623, 2010 WL 1875811, at *3 (W.D. Wash. May 10, 2010); *Eyles v. Uline, Inc.*, No. 4:08-CV-577-A, 2009 WL 2868447, at *4 (N.D. Tex. Sept. 4, 2009).  Finally, the third subsection explains that the *de minimis* exception is not applicable to time-rounding cases.  *Eddings v. Health Net, Inc.,* No. CV 10-1744-JST, 2012 U.S. Dist. LEXIS 51158, at *17-19 (C.D. Cal. Mar. 23, 2012);

Next, in Part F, Subsection 1, the Memorandum addresses the second scenario wherein the Defendants failed to pay, or otherwise compensate, Plaintiffs for time each spent driving company vehicles to and from jobsites while transporting employees, materials, tools, or equipment used on those jobsites.  Despite Defendants' refusal to recognize this, the law on this topic is settled.  Under the Portal-to-Portal Act, 29 U.S.C. §§ 251-262, it is settled law that driving from an employer's shop to jobsites is compensable as a principal activity when the driver is transporting tools, supplies, materials, or employees without which the employer could not be constructing  buildings. *Herman v. Rich Kramer Construction, Inc.*, No. 97-4308WMS, 1998 U.S. App. LEXIS 23329 (8th Cir. Mo. Sept. 21, 1998) *Rich Kramer Constr.*, 1998 U.S. App. LEXIS 23329, at*4; *Secretary v. E.R. Field, Inc.*, 495 F.2d 749, 751 (1st Cir. 1974); *Hodge v. Lear Siegler Services, Inc.* No. CV 06-263-MHW, 2008 U.S. Dist. LEXIS 45128 (D. Idaho June 9, 2008).  Next, in Part F, Subsection

2, the Memorandum addresses the third scenario wherein the Defendants failed to pay, or otherwise compensate, Plaintiffs for time each spent riding in company vehicles to and from jobsites after having loaded or prior to unloading materials, tools, or equipment used on those jobsites. Under the continuous workday rule, "the 'workday' is generally defined as 'the period between the commencement and completion on the same workday of an employee's principal activity or activities.'" *Alvarez*, 546 U.S. at 29, citing 29 C.F.R. § 790.6(b); *Ross v. Wolf Fire Prot., Inc.*, 799 F. Supp. 2d 518 (D. Md. 2011). Shop activities such as reporting to a designated meeting place, receiving assignments, and loading equipment are indispensable parts of an employee's principal activities. *Rich Kramer Constr.*, 1998 U.S. App. LEXIS 23329, at *7; *Hodgson v. Frisch's Dixie, Inc.*, No. 6641, 1971 U.S. Dist. LEXIS 12029, at *11 (W.D. Ky. Aug. 16, 1971), *aff'd*, 469 F.2d 82 (6th Cir.1972) (per curiam). Furthermore, travel that is an indispensable part of performing one's job is principal activity and is compensable as hours worked, such as where travel occurs after the first principal activity of the day is performed . 29 C.F.R. § 785.38; *Rich Kramer Constr.*, 1998 LEXIS 23329, at *4, 7; *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2004 U.S. Dist. LEXIS 16288, at **21-22 (N.D. Ill. Aug. 18, 2004). With those activities being compensable, the Memorandum then explains that the *de minimis* exception is subject to the aggregation doctrine, which requires adding all time spent loading and unloading together for purposes of determining whether the unpaid time was *de minimis*, and therefore not subject to mandatory inclusion in Plaintiffs' hours worked. *Reich v. New York City Transit Authority*, 45 F.3d 646, 649-50 (2d Cir. 1995); *Reich v. Monfort, Inc.*, 144 F.3d 1329 (10th Cir.1998); *Ross v. Wolf Fire Prot., Inc.*, 799 F. Supp. 2d 518, 523-524 (D. Md. 2011).

With those violations presented, the Memorandum, in Part G, then addresses the mandatory nature of the liquidated damages in an amount equal to the underpayments under the FLSA (and treble damages under Article II, Section 34a of the Ohio Constitution), *Elwell v. Univ. Hosps. Home Care Servs.,* 276 F.3d 832, 849 (6th Cir. 2002); *Martin v. Indiana Michigan Power Company*, 381 F.3d 574, 585 (6th Cir. 2004), and that Defendants have failed to proffer any evidence throughout these proceedings that could conceivable satisfy the good faith exception to those damages. To be sure, there is no good-faith exception to the treble damages awardable under Ohio's Constitution. Further, in Part H, the Memorandum discusses the mandatory nature of the award of costs and attorneys' fees after proving a violation of the FLSA (or Ohio's Constitution). *Farmer v. Ottawa County*, 2000 U.S. App. LEXIS 7224, 19-20 (6th Cir. Mich. Apr. 13, 2000); Art II, § 34a of Ohio's Constitution.

Last, in Part I, the Memorandum address Defendants' violation of Article II, Section 34(a) of the Ohio Constitution. Section 34a requires an employer to provide wage-and-hour records to an employee upon request. Its implementing statute, R.C. 4111.14(G)(3), further requires an employer to provide the wage-and-hour records within thirty days. Lacy requested this information on January 7, 2011, but the Company failed to provide this documentation for ten months until it responded to discovery requests on November 9, 2011. As such, the Company violated the Ohio Constitution and is, therefore, liable for Lacy's costs and attorneys fees incurred in obtaining the requested records. Ohio Const., Art. II, § 34a; see also *Pandey v. Rascal Unit, Ltd.*, No. 2:09-cv-550, 2010 U.S. Dist. LEXIS 54348 (S.D. Ohio Apr. 30, 2010).

**MEMORANDUM IN SUPPORT**

I.    **INTRODUCTION & FACTS**

    A.    **Background Establishing Applicability of the Fair Labor Standards Act.**

Defendant Reddy Electric Co. ("Reddy Electric," "Company," or "Employer") is a Xenia-based electrical contractor.  (Doc. 57, Second Am. Compl ¶ 7; Doc. 58, Answer to Second Am. Compl. ¶ 7.) Reddy Electric has revenue sufficient to make it subject to the terms of the FLSA.  (Doc. 60, Deposition of Julie Jordan [hereinafter "Jordan Dep."] Ex. 22, Answer to Interrog. No. 2.)  Indeed, Reddy Electric's annual revenue is approximately 15 to 17 million dollars per year.  (Doc. 60, Jordan Dep., p. 19.)  Currently, Reddy Electric employs approximately 90 employees.  (Doc. 61, Deposition of Jeffrey Eldridge [hereinafter "Eldridge Dep."], p. 19.)  Accordingly, Reddy Electric is an "employer" as that term is used and defined in the Fair Labor Standards Act.  (Doc. 60, Jordan Dep. Ex. 22, Response to Req. for Admission No. 1.)

Defendant Jeffrey Eldridge is a part owner[1] and the Vice President of Reddy Electric. (Doc. 61, Eldridge Dep., pp. 7-8.)  As Vice President, he has a role in business development, human resources, and dealing with Reddy Electric's manpower in the field. (*Id.*) He also works with Reddy Electric's estimating staff and project managers.  (*Id.*)  Relevant to these proceedings and to Mr. Eldridge's status as an "employer" under the FLSA, he testified as follows:

        Q.    Do you have the power to hire and fire employees?
        **A.    I do.**
        Q.    Do you supervise employee work schedules?
        **A.    Yes.**
        Q.    Do you supervise conditions of employment?
        **A.    Yes.**

---

[1] Mr. Eldridge owns approximately 16.5% of Reddy Electric.  (Doc. 61, Eldridge Dep., p. 8.)

13

Q.     And do you determine the rate of pay for any of the
       employees?
**A.     Yes.**

\* \* \*

Q.     And I believe you said this, but you're involved in the
       day-to-day operations of the company?
**A.     Yes**
Q.     And you supervise employee tasks?
**A.     Yes.**
Q.     And evaluate the employees' performances?
**A.     Yes.**
Q.     And you do direct the way employees perform the
       functions of their
       job?
**A.     Yes.  In this respect, there's people who help us.  I
       mean, I don't do everything myself.**
Q.     Like, for instance, the foremen or the supervisors?
**A.     Exactly. The field superintendent.**
Q.     Okay. And then they would report to you?
**A.     Right.**

(Doc. 61, Eldridge Dep., pp. 8-10.)

Both Plaintiffs Cody Lacy and Kyle Syx, were employed by Reddy Electric as
construction workers. (Doc. 57, Second Am. Compl ¶¶ 4, 6; Doc. 58, Answer to Second Am.
Compl. ¶¶ 4, 6.) Plaintiff Lacy worked for Reddy Electric from 2009 through 2010, and
Plaintiff Syx worked for Reddy Electric from 2010 until 2011.  (*Id.  See also* Doc. 60, Jordan
Dep. Exs. 9, 16, Lacy and Syx Timecard Reports.)

 **B.**  **Cody Lacy's Employment**

Plaintiff Lacy began working for Reddy Electric part-time while he was a career
center student during high school.  (Doc. 27, Deposition of Cody Lacy [hereinafter "Lacy
Dep."], p. 8.)  During this period, Lacy would work for two weeks, and then go to classes for
two weeks.  (*Id.*, pp. 8-9.)  While working, he received school credit for on-the-job training.
(*Id.*, pp. 8-9.)  During this time, he worked in the shop fabricating materials for Reddy

Electric.  (*Id.*, p. 9.)  When there was no specialized work to perform, he would wash vehicles.  (*Id.*) After graduating from high school in May 2010, Lacy began working full-time for Reddy Electric.  (*Id.*, p. 8.)

Reddy Electric classified Lacy first as an electrical helper.  (Doc. 60, Jordan Dep., p. 59.)  Then, after he began schooling, Reddy Electric changed his classification to an electrical apprentice.  (*Id.*)  Plaintiff Lacy's responsibilities, as contained in the job description for both an electrical helper and an electrical apprentice, were identical.  (*Id.* at Exs. 2, 3.)  Relevant to these proceedings, two of the expressly stated Project Responsibilities were:

> H.    Gathers tools and supplies to be used at work site
>
> *    *    *
>
> N.    Maintains tools and equipment and keeps supplies and parts in order

(*Id.* at Exs 2, 3.)

After assuming full-time status, Plaintiff Lacy spent the first week in the shop.  (Doc. 27, Lacy Dep., p. 10.)  After that first week, the Reddy Electric sent him to the Talawanda Project near Oxford, Ohio.[2]  (*Id.*, p. 10.)  For the first four to six weeks on the Talawanda Project, Lacy drove his personal vehicle from his personal residence to the jobsite.[3]  (*Id.*, p. 10.)  After that, beginning roughly July 1, 2010, Lacy began commuting via a Company-owned vehicle.[4]  (*Id.*, pp. 10, 12.)

---

[2] Lacy also worked on the Arcanum-Butler Project.  (Doc. 27, Lacy Dep., pp. 21-22.)  But Lacy drove his own vehicle to that project from his residence.  (*Id.*) As such, his drive time and loading/unloading claims do not relate to this project.  There may, however, be claims related to the unlawful time-rounding policy on that project.

[3] To be clear, Plaintiffs do not seek (and never have sought) compensation for travel time related to hours Lacy spent commuting from his personal residence to the jobsite(s) in his personal vehicle because, among other things, he never was required to stay overnight in Oxford or Arcanum, Ohio.

[4] It is undisputed that Lacy voluntarily chose to use a company vehicle to commute to and from jobsites.  But, it should also be, but certainly will not be, undisputed that while driving the Company vehicle to or from a jobsite while transporting Company employees, tools, equipment, and/or materials, the Defendants

Lacy described his role after he began driving a Company vehicle to and from the Talawanda Project jobsite as follows;

> Once there was a truck going down there to the job, we would come in and we would load anchor bolts, pipe, little things they would ask us to pick up. Some days it was a gang box. We would have to load a gang box on a stakebed and just material-wise like that. We would get in and I would drive down to Talawanda.

(Doc. 27, Lacy Dep., p. 11.) Lacy asserted that he was "always the one driving from the shop to the job," (*id.*, p. 12), and for the most part, he drove both to and from the jobsite. (*Id.*, p. 16.) He drove an S-10 pick up truck most of the time, but on occasion, also drove a Company-owned stakebed truck. (*Id.*, pp. 12-13.) Jacob Burns always rode with Lacy to the Talawanda jobsite, yet Burns only drove the vehicle a couple of times. (*Id.*, p. 16.) The Talawanda jobsite was between an hour and fifteen minutes and an hour and half from Reddy Electric's shop in Xenia, Ohio. (*Id.*, p. 14; Doc. 60, Jordan Dep. Ex. 17.)

Most of the time, Lacy would load various materials, tools, or equipment into the truck at the shop prior to driving to the jobsite. Lacy would load pipe, conduit, boxes of couplings, gang boxes, anchor bolts, concrete blankets, and other boxes of materials that would have arrived the day prior. (Doc. 27, Lacy Dep., p. 15.) On a typical day, it would take Lacy at least ten minutes to complete these tasks. (*Id.*, p. 15.) He testified that he knew which material to put into the truck because either the material already had job numbers taped to it or, the day prior, he would be told which material to bring the next day. (*Id.*, pp. 15-16.)

---

received beneficial work from Lacy, for which that they were required to compensate him. It should also be undisputed that loading and unloading Company vehicles is compensable time unless the *de minimis* rule exempts it from compensation. And, it should be undisputed that where the time is not exempt by way of application of the *de minimis* rule, then the continuous workday rule necessitates the conclusion that the drive time after loading and drive time prior to unloading was compensable time.

Eighty to eighty-five percent of the time Lacy would transport items back to the shop from the Talawanda jobsite.  (Doc. 27, Lacy Dep., p. 18.)  This included things like empty spools of wire, other refuse, and clean-up supplies.  (*Id.*, p. 18.)  There were also a few times where Lacy transported materials back to the shop, or to another jobsite, after clocking-out for the day as well.  (*Id.*, pp. 17-18.)  To be sure, during the return trip, Lacy was also transporting coworker Burns in the S-10 pick up truck.  (*Id.*, p. 19.)  When Lacy returned to the shop, he would spend, on average, ten minutes unloading the supplies and materials from the truck and putting them where they belong.  (*Id.*, p. 28.)

Aside from loading, unloading, and driving, Lacy also identified additional duties he performed at the jobsites prior to clocking in.  On the Arcanum Project, after arriving at the jobsite, but prior to clocking in, Lacy would unlock the trailer, unlock the gang boxes, and get everything ready before the rest of the employees would arrive, like get hand tools out.  (Doc. 67, Second Deposition of Code Lacy [hereinafter 2d Lacy Dep."], pp. 52, 56.)  This process would usually take Lacy approximately ten to fifteen minutes per day.  (*Id.*, p. 54.)  Lacy would get the key to unlock these things either from the foreman, Tom Wicker, or someone else in the trailer.  (*Id.*, p. 53.)  Lacy would then walk back to the trailer, and once everyone else arrived at the trailer, he would then clock-in for work that day.  (*Id.*, pp. 52, 54, 58-59.)  On the Talawanda Project, prior to clocking-in for the day, Lacy would unlock the material trailer, unlock the gang box, load tools like heat guns, if needed, into the foreman's truck, and then report back to the job trailer to clock in for the morning.  (*Id.*, pp. 63-64.)  This off-the-clock work would take Lacy approximately ten minutes per day.  (*Id.*, p. 63.)

During discovery, Defendants admitted all necessary facts to determine, without regard to the amount of back pay owed, that Defendants violated the FLSA with respect to Cody Lacy.  To begin, Defendants admitted that Plaintiff Lacy "sometimes drove a company vehicle from the shop to the jobsite, that on some occasions another employee was a passenger and that from time to time small amounts of material w[ere] transported in the vehicle."[5] (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission No. 3.) Defendants also admitted that Plaintiff Lacy "sometimes dr[o]ve a company vehicle from the job site to the shop, that on some occasions another employee was a passenger and that from time to time small amounts of material was transported in the vehicle."[6] (*Id.,* Response to Req. for Admission No. 6.)  Likewise, it is undisputed that Defendants failed to pay Plaintiff Lacy "for the period before he signed in and began his work shift or after he signed out at the end of his shift." (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission Nos. 4, 7.)  Lastly, Defendants admittedly "did not maintain any records for [Lacy's] activity prior to him signing in to begin his shift, nor did it maintain records of what he did after he signed out at the end of this shift." (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission Nos. 5, 8.)

### C.    Kyle Syx's Employment

Kyle Syx began working for Reddy Electric in June 2010, after graduating from high school.  (Doc. 28, Deposition of Kyle Syx [hereinafter "Syx Dep."], p. 6.) Prior to graduating from high school, Syx had taken two years of electrical courses at the Greene County Career

---

[5] In that admission, Defendants again asserted their baseless defense that Lacy drove the Company vehicle, at his request, to save gas expenses and to save wear and tear on his vehicle.  Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission No. 3.) But, as will be addressed below, those defenses are misplaced.

[6] Also in this admission, Defendants again asserted the same three, baseless defenses. Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission No. 6.)

Center. (*Id.*, p. 7.) Reddy Electric classified Syx first as an electrical helper. (Doc. 60, Jordan Dep., p. 59.) Then, after he began schooling, his classification changed to an electrical apprentice.[7] (*Id.*) As stated above, two of the expressly stated Project Responsibilities for an electrical helper and an electrical apprentice were:

> H.     Gathers tools and supplies to be used at work site
>
> *     *     *
>
> N.     Maintains tools and equipment and keeps supplies and parts in order

(*Id.* at Exs 2, 3.)

Syx worked at two project sites: one in Arcanum and one in Oxford. (Doc. 28, Syx Dep., p. 7.) The Arcanum Project was approximately one hour and forty-five minutes from Reddy Electric's shop in Xenia, Ohio.[8] (*Id.*, p. 8; Doc. 60, Jordan Dep. Ex. 18.) The Talawanda Project was approximately an hour and fifteen minutes to an hour and a half from Reddy Electric's shop. (Doc. 27, Lacy Dep., p. 14; Doc. 60, Jordan Dep. Ex. 17.)

### 1.     *The Arcanum Project*

For the first month of Syx's employment, he commuted from his residence to the Arcanum Project.[9] After that, however, Syx met several other employees at the shop every morning at roughly 5:00 a.m., and then all of those employees would go to the Arcanum Project together in a company vehicle.[10] (Doc. 28, Syx Dep., p. 8.) The regularly scheduled start time for Reddy Electric's employees on the Arcanum Project was 7:00 a.m. (*Id.*, p. 8.)

---

[7] While working for Reddy Electric, Syx's immediate supervisor was Defendant Jeffrey Eldridge. (Doc. 28, Syx Dep.. p. 7.)

[8] The Arcanum Project was one and one-half hours away from Syx's home address. (*Id.*, p. 8.)

[9] Absent one instance where the Company required Syx to transport a truck bed full of materials back to the shop from Arcanum and unload those materials himself, Plaintiffs do not allege any travel time related to this first month is unpaid compensable time in this action.

[10] Defendants will undoubtedly highlight that Syx acknowledged that the Company did not require him to "take the company van as opposed to driving [his] own vehicle," and that it was his choice. (*Id.*, pp. 8-9.) He also acknowledged that his choice to take the company van was motivated by his desire to save money on gas

As Syx testified, while working on the Arcanum Project, on a typical day after reporting to the shop at 5:00 a.m., "[d]epending on what the day needed, at times [he and other employees] would load up material from the shop, load up tools and *et cetera*, and then [they] would all get into the van and drive down [to the jobsite.]" (*Id.*. p. 9.)  The van was a full-size van that would hold roughly eleven people, but typically carried seven to eight Company employees.  (*Id.*)  Sometimes, once per week, he would load equipment into the van prior to it departing from the shop.  (*Id.*, pp. 9-10.)  When doing so, the driver of the van "would drive around to the shop and grab [the material] and load it up and take it down" to the jobsite.  (*Id.*, p. 11.)  This material included "wire, boxes, mud rings, basic material along those lines."  (*Id.*, p. 10.)  Syx would either load the material in the back of the van, on the seats of the van, or on the floor of the van.  (*Id.*)  It would take from five to fifteen minutes to load the materials on a daily basis.  (*Id.*)

Syx also testified that he knew what materials to load into the van because the Company would provide the foremen or one of the journeymen a list of what was needed on the job for that particular day.  (*Id.*, p. 11.)  As an electrical apprentice, because he was "lower on the chain," the other employees looked to him to load the van prior to the van departing the shop to the jobsite.  (*Id.*)  Syx also wanted "to make a good impression, so [h]e would typically get out and get [the materials]."  (*Id.*)  Sometimes, another employee would help him perform that function.  (*Id.*, p. 12.)

Five employees were transported in the Company van to the Arcanum Project:  Syx, Doug Brooks, Jeff Graham, an employee named Steve, and Matt Johnson.  (*Id.,* p. 26.)

---

and the wear and tear on his personal vehicle.  (*Id.*)  That, however, does not exempt these "hours worked" time from being compensable under the FLSA as Defendants have repeatedly argued.

Typically, Syx drove the van at least once per week, but would sometimes drive as often as two to three times per week.  (*Id.*, p. 13.)  When he was merely a passenger in the vehicle, he would "sit there and drink coffee or look outside."  (*Id.*, p. 14.)  Syx would also drive the Company van back to the Company's shop after everyone had clocked out at the jobsite.  (*Id.*, p. 15.)  Once every two weeks, Syx would also unload materials from the van that were being brought back to the shop from the jobsite.  (*Id.*)  Typically, Syx unloaded extra materials that were no longer needed on the project, such as devices, wire, boxes, and mud rings.  (*Id.*)  On those occasions, it would take Syx, at most, 10 minutes to unload the Company van.  (*Id.*, pp. 16-17.)

There was also one instance where Syx, while driving his personal vehicle to and from the jobsite, was required by Reddy Electric's foreman, Tom Wicker, to transport a truck bed full of Reddy Electric material—mainly wire—from the jobsite back to Reddy Electric's shop and unload that material himself.  (*Id.*, pp. 12-13, 16.)  In that instance, it took Syx half an hour to unload the vehicle, and that was even after an hour and forty-five minute drive to the shop.  (*Id.*, p. 16.)  Syx was not compensated for any that time.  (*Id.*)

### 2.     *The Talawanda Project*

On the Talawanda Project, Syx initially drove the Company van for the first month of the Project.  For the first two weeks, Syx travelled alone in the van, but after the initial two weeks, he transported another employee with him.  (Doc. 28, Syx Dep., p. 18.)  After that, Syx traveled to the Project in a five-person car.  (*Id.*, pp. 17-18.)  While working on the Talawanda Project and driving the Company van, Syx transported material and supplies from the shop to the jobsite typically once or twice a week.  (*Id.*, p 18-19.)  Typically, he would transport devices, boxes, and basic rough-in materials.  (*Id.*, p. 19.)  It would take Syx

approximately ten to fifteen minutes to load the van with these materials. (*Id.*, p. 19.) Once Syx began operating the car instead of the van, he no longer loaded materials, but sometimes he would transport tools—such as hand tools, benders, and drills—to the Talawanda Project. (*Id.,* pp. 19-21.) He would transport these tools once or twice a week. (*Id.*) To be sure, he drove the car twice a week. (*Id.*, p. 21.) While in the car, Syx would not transport materials or supplies back to the shop after he clocked out for the work day. But, it is important to note, that during all but the first two weeks of work on the Talawanda Project, Syx was driving (thus, transporting) at least one other Reddy Electric employee, if not more. (*Id.*, pp. 18, 20.) Four employees rode in the van off and on: Syx, Dakota Lacey, Doug Brooks, and Shawn Beringer. (*Id.*, p. 24.) There typically were four employees in the car, namely Syx, Doug Baker, Shawn Beringer, and Doug Brooks. (*Id.*) Finally, there were also three or four occasions where Syx would drive the foreman's truck from the jobsite to the shop, and then take a different vehicle back to the jobsite the following morning after loading materials into it. (*Id.,* pp. 21-22.)

Defendants also made a number of admissions with respect to Syx's employment. It is undisputed that Plaintiff Syx "sometimes traveled in a company vehicle [to] the jobsite [from] the shop, that on some occasions other employees were passengers, and that from time to time a small amount of material was transported in the vehicle."[11] (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission No. 11.) And, Defendants admitted that Plaintiff Syx "sometimes traveled in a company vehicle from the jobsite to the shop, that on some occasions other employees were passengers and that from time to time a small

---

[11] Also in this admission, Defendants again asserted the same three, baseless defenses. (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission No. 11.)

amount of material was transported in the vehicle."[12]  (Dep. 60, Jordan Dep. Ex. 21, Response to Req. for Admission No. 14.)  Indeed, Defendant Eldridge even admitted that Plaintiff Syx had driven the Company's van with a number of Reddy Electric's employees inside.  Specifically, he testified:

> **A.**    **Can I just add one thing?**
> Q.    Sure.
> **A.**    **I don't know that this is going to make a lot of difference, but the story in the field is *I know Kyle drove some because I heard the report that he was a terrible driver and nobody wanted him to drive.* I'll be honest with you. I heard that report, that they didn't want him driving. So it sounded like they did everything they could to avoid the situation. That's what Doug told me.**

(Doc. 61, Eldridge Depo., pp. 50-51.) (emphasis added).  Defendants similarly admitted that they did not compensate Plaintiff Syx "for the period before he signed in and began his work shift" or "for the period after he signed out and ended his work shift."  (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission Nos. 12, 15.)  Lastly, Defendants admitted that they "did not maintain any records for Syx's activity prior to him signing in to begin his shift, nor did it maintain records of what he did after he signed out at the end of this shift."  (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission Nos. 13, 16.)

### D.    The Employer's Rounding Policy

Reddy Electric keeps track of its employees' compensable time through use of a time-recording system called DataMAX.  (Doc. 60, Jordan Dep., p. 20.)  The clock-in and clock-out procedures are the same. (*Id.,* p. 84.)    The system works as follows.[13]  The

---

[12] Also in this admission, Defendants again asserted the same three, baseless defenses. (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission No. 14.)

[13] This process was described by Julie Jordan, who is the Controller for Defendant Reddy Electric.  (Doc. 60, Jordan Dep., p. 9.)  Her duties include, among other things, in-house accounting and financials and

23

foremen on Reddy Electric's various projects have cell phones with the DataMAX program installed on them.  (*Id.*, p. 20.)  At some point after the employees arrive at the jobsites, the employees clock in via the foreman's cell phone.  (*Id.*)

In this cell phone program, the employees enter their employee number, job name, and the code for the work they will be performing.  (*Id.*, pp. 23-24.)  The foreman then reviews the data the employee entered, verifies it, and then electronically sends the information into Reddy Electric's office for processing.  (*Id.*, p. 54.)  The time at which the clock in and clock out occurs is not input by either the employees or the foreman. (Jordan, p. 55.)  Instead, it is self-generated by the program.  (*Id.*, p. 55.)  The employee has no chance or ability to override the time provided by the program.  (*Id.*, pp. 55-56.)

The clock-in/clock-out information is then sent electronically to Reddy Electric's office and is saved on its server.  (*Id.*, pp. 20-21.)  Once on the server, it is "dumped" into Reddy Electric's accounting system and then into each employee's file.  (*Id.*, p. 21.)  The employee's hourly wage is preset in the accounting system.  (*Id.*, p. 22.)  So, once the hours are dropped into the system, it then determines the employee's pay based upon the hours worked and the hourly rate of pay.  (*Id.*)  After the pay is determined, employees are then paid based upon this data at the appropriate point in the pay week.  (*Id.*)

As to the time that is compensable under Reddy Electric's policies, its representative, Julie Jordan, testified as follows:

> Q.  Okay. So I believe we talked about this earlier, but employees are paid from the time they clock in until the time they clock out?

overseeing payroll.  (*Id.*, pp. 9-10.)  She maintains the Company's payroll documentation and is responsible for the Company's records.  (*Id.*, p. 10.)  And, she has, and had during her deposition, the authority to answer questions on behalf of Reddy Electric.  (*Id.*, p. 11.)

> **A.**   **Correct.**
> Q.   Okay. So by default, that's considered payable time, according to the company's policies?
> **A.**   **Correct.**

(*Id.*, p. 95.)  Nevertheless, Reddy Electric utilizes a time-rounding policy to determine the total reported hours upon which employees will be paid.  (Doc. 60, Jordan Dep., p. 85.)  Ms. Jordan testified that the system takes the total clocked-in time an employee works during any given day; when applicable, backs out a lunch period;[14] and then rounds the total time per the employer's time-rounding policy.  (*Id.*, p. 86.)  Initially, Ms. Jordan testified that she believed the employer's time-rounding policy rounded "to the next quarter hour as to either forward or backward to the quarter hour."  (*Id.*, p. 85.) But, after being confronted with Plaintiff Lacy's DataMAX time cards, which were entered as Exhibit 9 during the Jordan deposition, she changed her testimony to acknowledge that the Company actually used an unlawful thirty-minute time-rounding policy.  She testified as follows:

> Q.   Okay. Let's skip ahead to page [REC]00143. If we go down four lines to November 10, 2009, here, we have a clock time of 3.82, a regular time of 3.5. So shouldn't that have rounded up to four hours if it's going by quarter hour increments?
> **A.**   **I guess. I said quarter. It must be half hours. I don't know. That might have been an error. I did say quarter. I guess I would have to verify that. But I believe -- I know it rounds, so –**

(*Id.*, p. 88.)  Expounding upon that, Ms Jordan testified:

> Q.   So if it were a quarter of an hour rounding time, you would agree that Lacy should have been paid for four hours on November 10, 2009, for the afternoon portion of the day?

---

[14] With regard to lunch and rest breaks, the Company policy provides: "A normal work day for the field employee is eight hours long, 7:30a.m. - 4:00p.m., with a 30 minute lunch and 1 15 minute break."  (Doc. 60, Jordan Dep. Ex. 1, p. 8, REC0010.)  To be sure, employees are not prohibited from combining non-compensable thirty-minute lunch break with the compensable fifteen-minute break.

> A.    **Yes.**
> Q.    And if it's a half hour, then no?
> A.    **Yes.**
> Q.    Let's go over to 12-2, the next page, page 144, and talk about December 2, 2009. In the afternoon there, we have the, 3.8 hours of clock time and it was rounded down to 3.5. If we are talking about quarter hours, that should have gone the other way, correct?
> A.    **Correct.**

(*Id.*, p. 89.)[15]

This time-rounding system was not communicated to employees in the Company's Employee Handbook. (Doc. 60, Jordan Dep. Ex. 1.)    And no document produced during discovery or ever identified by Defendants evidenced this secret time-rounding policy, or even suggested such was communicated to Reddy Electric's employees.[16] Further illustrating the untold nature of Reddy Electric's time-rounding policy, Syx testified that he had no understanding on the issue of whether his time was rounded up or down, and that no one ever talked to him about the Reddy Electric's time-rounding policy.    (Doc. 68, Second Deposition of Kyle Syx [hereinafter "2d Syx Dep."], p. 58.)  Similarly, Lacy testified that he was under the impression that he was being paid from the time he clocked-in in the morning until the time he clocked-out at the end of the workday.  (Doc. 67, 2d Dep. Lacy, p. 49.)

### E.    Lacy's Pre-Suit Employment Records Request

On January 7, 2011 at the direction of, and on behalf of, Plaintiff Lacy, his agent sent a request by both facsimile and electronic mail to Reddy Electric care of its Vice President,

---

[15] This is only one example of this practice.

[16] It is unfortunate that Plaintiffs only learned of this time-rounding policy well after the conditional certification process had concluded.  Otherwise, another ninety-plus potentially underpaid employees would have had the opportunity to redress their unknown injuries.

Jeffrey Eldridge, requesting a number of his employment records.[17]  (Pls.' Mot. for Partial Summ. J. Ex. 1, Affidavit of Cody Lacy [hereinafter "Lacy Aff."], pp. 3-4; Doc. 60, Jordan Dep. Ex. 24.)  This employment records request sought fourteen separate categories of employment records including, but not limited to, his personnel file, complete earnings-and-deductions reports, all employee handbooks, all documents that reflected his hours worked, job descriptions, paystubs, and travel-time policies.  (*Id.*)  Despite that request being sent on January 7, 2011, Reddy Electric failed to respond with the requested documents until it chose to respond to Plaintiff Lacy's First Set of Discovery Responses. (Pls.' Motion for Partial Summ. J. Ex. 1, Lacy Aff. ¶ 13.)  As the cover letter and certificate of service demonstrate, that did not occur until after November 9, 2011—a full ten months later.  (Doc. 60, Jordan Dep. Ex.  22.)   To be sure, there was no agreement between the parties to hold the document production—mandated under Ohio's Constitution—in abeyance prior to filing the lawsuit.  (Pls.' Motion for Partial Summ. J. Ex. 1, Lacy Aff. ¶¶ 7-10.)  Nor was there any agreement after this suit was filed.  (*Id.* ¶¶ 8, 10-12.)  And counsel for Defendants admitted that all responsive documents were not transmitted to Lacy or his counsel until the middle of November 2011.  (*Id.* ¶ 13; Doc. 60, Jordan Dep., pp. 141, 143.)

## II.  LAW AND ARGUMENT

### A.  Summary Judgment Standard

"Summary judgment is appropriate if, after examining the record and drawing all inferences in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Martin*

---

[17] Defendant Eldridge admitted that all address information, including the fax number and email address, in Lacy's employment records request was accurate.  (Doc. 61, Eldridge Dep., p. 64.)

*v. Ind. Mich. Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004) (citing Fed. R. Civ. P. 56(c)). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). It is not enough for the [non-moving] party to "rest on mere allegations or denials of his pleadings." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250

In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

### B.    General Requirements of the Fair Labor Standards Act

The Fair Labor Standards Act was enacted to protect "the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (quoting *Tenn. Coal. Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)). It is "remedial and humanitarian in purpose" and "should be broadly interpreted and applied to effectuate its goals." *Id.* (internal citation and quotation marks omitted). Generally speaking, through testimony and exhibits, such as time cards, the employees can establish generally the hours that they worked. See *Bueno v. Mattner*, 829 F.2d 1380, 1387 (6th Cir. 1987), cert. denied,

486 U.S. 1022 (1988).[18]

The Act mandates that employers pay a minimum wage to covered employees for each hour worked and pay overtime for work in excess of 40 hours per workweek. 29 U.S.C. §§ 206(a)(1), 207(a)(1). Because the FLSA does not define the term "work," a "recurrent question under the Act has been when the compensable workday begins and ends." *Sepulveda v. Allen Family Foods, Inc.*, 591 F.3d 209, 213 (4th Cir. 2009). "The question often arises whe[n], as here, employees perform some tasks before productive work begins." *Id.*

The Supreme Court has held that "work" is the "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *Tenn. Coal*, 321 U.S. at 598. But, shortly thereafter, the Supreme Court modified this definition to determine that "exertion" was not necessary for an activity to constitute "work." *Armour & Co. v. Wantock*, 323 U.S. 126 (1944). In *IBP v. Alvarez*, 546 U.S. 21 (2005),[19] a unanimous Supreme Court reviewed and reaffirmed its historic definition of "work" under the FLSA. There, the Supreme Court also stated that it has defined the terms "work" and "workweek" "broadly. *Id.*, at 519.

In *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), the Court noted that it defined "the statutory workweek" to include "all time during which an employee is

---

[18] To be sure, where records are not kept, employees' reasonable approximations are appropriate. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946), superseded on other grounds by statute as stated in *IBP, Inc. v. Alvarez*, 546 U.S. 21, 41, 126 S.Ct. 514, 527 (2005).

[19] In *Alvarez*, the Supreme Court held that employees who work in meat and poultry processing plants must be paid for the time they spend walking between the place where they put on and take off protective equipment and the place where they process the meat or poultry. *Alvarez*, 546 U.S at 37. The Court determined that donning and doffing gear is a "principal activity" under the Portal to Portal Act, 29 U.S.C. 254, and thus time spent in those activities, as well as any walking and waiting time that occurs after the employee engages in his first principal activity and before he finishes his last principal activity, is part of a "continuous workday" and is compensable under the Fair Labor Standards Act, 29 U.S.C. 201 et seq. *Alvarez*, 546 U.S at 33-34.

necessarily required to be on the employer's premises, on duty or at a prescribed workplace, [and that] the time spent in these activities must be accorded appropriate compensation." *Id.* at 690-91.  And Department of Labor regulations define the "workday" as "the period between the commencement and completion on the same workday of an employee's principal activity or activities" including "all time within that period whether or not the employee engages in work throughout all of that period." 29 C.F.R. § 790.6 (b).

Furthermore, the Code of Federal Regulations provides that "[w]ork not requested but suffered or permitted is work time." 29 C.F.R. § 785.11.   That regulation on to express that "[t]he reason [for the work] is immaterial. The employer knows or has reason to believe that he is continuing to work and the time is working time." 29 C.F.R. § 785.11.  This rules expressly applies "to work performed away from the premises or the job site, or even at home. If the employer knows or has reason to believe that the work is being performed, he must count the time as hours worked." 29 C.F.R. § 785.12.  Importantly, the regulations have established that "it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed." 29 C.F.R. § 785.13.  An employer cannot "sit back and accept the benefits without compensating for them." *Id.*  In fact, "[t]he mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so." 29 C.F.R. § 785.13.

### 1.     *The Portal-to-Portal Act Exemptions Are Exceptionally Narrow, and Do Not Alter the Concept of Compensable Work Prior To or After the Actually Paid Workday.*

The Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262, ("PPA") which amended the FLSA, exempts from compensation certain activities that had been treated as compensable work. *Alvarez*, 546 U.S. at 25-26.  Importantly, in construing the FLSA along with the Portal-

to-Portal Act, the judicially recognized rules for construing each should be kept in mind. The FLSA should be construed broadly "so as to give effect to Congress's intentions and policies." *Salyer v. Ohio Bureau of Workers' Comp.,* 83 F.3d 784, 786 (6th Cir. 1996); 29 C.F.R. § 790.2(a). And the FLSA exemptions should be narrowly construed, and the employer has the ultimate burden of proving any exemption applies. *Herman v. Palo Group Foster Home*, 183 F.3d 468, 472 (6th Cir. 1999).

With that in mind, other than the PPA's express exceptions for travel to and from an employee's principal activity and for other preliminary or postliminary activities, the PPA does not change the conception of "work" or define the workday. *Id*; 29 U.S.C. § 254(a). Even then, the PPA excludes only those activities that are undertaken "for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer." *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 398-99 (5th Cir. 1976).

"[T]he term 'principal activity or activities' in Section 4 [of the Portal-to-Portal Act] embraces all activities which are an 'integral and indispensable part of the principal activities.'" *Alvarez*, 546 U.S. at 29-30 (alteration in original) (quoting *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956)). Thus, importantly, activities "performed either before or after the regular work shift" remain compensable "if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1)." *Id.*

As such, under the FLSA, an activity is compensable when it is an "integral and indispensable part of the principal activities." *Steiner,* 350 U.S. at 256; *see Mitchell v. King Packing Co.,* 350 U.S. 260, 261-63 (1956); *Brock v. City of Cincinnati,* 236 F.3d 793, 803 (6th

Cir. 2001); *see also* 29 C.F.R. § 790.8 (c) ("Among the activities included as an integral part of a principal activity are those clearly related activities which are indispensable to its performance."). Employees may have more than one principal activity, and such activities are not limited to the predominant activity. *See* 29 C.F.R. § 790.8(a). The term "principal activities" should be construed "liberally in the light of the foregoing principles to include any work of consequence performed for an employer, not matter when the work is performed." 29 C.F.R. § 790.8(a); *Duchon v. Cajon Co.,* No. 86-4009, 1988 U.S. App. LEXIS 2167, at * 10 (6th Cir. Feb. 22, 1988) (per curiam).

The implementing regulations define compensable work time as time spent by a worker for the benefit of the employer, with the employer's actual or constructive knowledge, performing the worker's "principal" activity or functions integral to his or her principal activity.  29 C.F.R. §§ 785.6-7, 785.9, 785.11, 785.24.  Principal activity or functions integral to an employee's principal activity has been defined to include "all activities which are an integral part of a principal activity."  29 C.F.R. § 785.24(b).  In the same regulation, the Department of Labor also set forth two examples to demonstrate what is meant by an integral part of a principal activity.  They are the following:

> (1) In connection with the operation of a lathe, an employee will frequently, at the commencement of his workday, oil, grease, or clean his machine, or install a new cutting tool. Such activities are an integral part of the principal activity, and are included within such term.
>
> (2) In the case of a garment worker in a textile mill, who is required to report 30 minutes before other employees report to commence their principal activities, and who during such 30 minutes distributes clothing or parts of clothing at the workbenches of other employees and gets machines in readiness for operation by other employees, such activities are among the principal activities of such employee.

Furthermore, "[s]uch preparatory activities, which the Administrator has always regarded as work and as compensable under the Fair Labor Standards Act, remain so under the Portal-to-Portal Act, regardless of contrary custom or contract."  29 C.F.R. § 785.24(b).

As noted above, the Supreme Court's central holding in *Alvarez*, 546 U.S. at 37, is that time spent after the beginning of the first principal activity, including time spent walking, is not affected by section 4(a) of the PPA, 29 U.S.C. 254(a), and is therefore compensable.  In upholding the "continuous workday" principle incorporated in the regulations, the Court stated:

> [D]uring a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of the [Portal-to-Portal Act], and as a result is covered by the FLSA.

*Alvarez*, 546 U.S at 29.  The Court therefore reversed that part of the First Circuit's decision in *Tum v. Barber Foods*, 331 F.3d 1, 4-5 (2003), which held that walking time which took place after the first principal activity was excluded from compensation under the PPA.  Similarly, in fashioning its holding, the Court *rejected* the argument that an activity that is integral and indispensable to a principal activity may not start the workday.  The Court noted that in *Steiner*, 350 U.S. 247, it "made clear" that activities that are integral and indispensable to principal activities are themselves principal activities that start the workday.  The Supreme Court states: "[W]e hold that any activity that is 'integral and indispensable to a principal activity' is itself a 'principal activity' under section 4(a) of the Portal–to-Portal Act."  *Alvarez*, 546 U.S at 37.

The fact is, employees have often succeeded in making off-the-clock claims, and in defeating employers' attempts to invoke the preliminary/postliminary defense, where pre-

33

or post-shift work was performed by employees because it was necessitated by employees'
work assignments, *even if the employer did not ask that the work be performed outside
employees' scheduled shift*. The Second Circuit's decision in *Kosakow v. New Rochelle
Radiology Associates, P.C.*, 274 F.3d 706 (2d Cir. 2001), is illustrative. There, a "radiological
technologist" was expected to receive patients at the commencement of her shift, and in
order to do so she had to arrive early to complete certain pre-shift tasks. Specifically, in
order to be able to receive patients at the beginning of her shift, she had to come in fifteen
minutes early to turn on the x-ray machine to allow it to warm up; perform tests on the
machine to make sure it was working properly; and pull patient files for individuals with
appointments that day. The defendant argued, and the lower court held, that the off-the-
clock work alleged by the plaintiff was excluded from FLSA coverage by the PPA's
amendments.

The Second Circuit reversed, finding that the work was compensable principal
activity, rather than non-compensable preliminary or postliminary activity, because it was
"'an integral and indispensable part of the principal activities for which covered workmen
are employed . . . .'" *Id.* at 718 (quoting *Steiner*, 350 U.S. at 256). It was irrelevant, the court
explained, that the employer had not directed the plaintiff to come in early—"If the proper
performance of their job required the preparatory work to be completed when the first
walk-in patient could potentially arrive, the time should have been counted, regardless of
whether anybody specifically instructed them to arrive early." *Id.* at 718.

As such, preliminary or postliminary activities are excluded from FLSA coverage
only where (1) such activities are predominantly in employees' own interests, (2) are
undertaken for employees' own convenience, (3) are not required by the employer, and (4)

are not necessary to the employee's performance of his or her work duties. *Jerzak v. City of South Bend*, 996 F. Supp. 840 (N.D. Ind. 1998); *Hellmers v. Town of Vestal, N.Y.*, 969 F. Supp. 837 (N.D.N.Y. 1997); *U.S. v. Ewald Iron Co.*, 67 F. Supp. 67 (W.D. Ky. 1946).  Accordingly, the preliminary/postliminary exception is extremely narrow.

> **2.      An Employer's Obligation to Maintain Records and the Legal Presumption Created in the Event the Employer Fails to Adhere to Those Obligations.**

The FLSA provides that "[e]very employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records . . . ." 29 U.S.C. § 211(c). An employer's failure to keep such records is a violation of the FLSA.  29 U.S.C. § 215(a)(5). In *Anderson v. Mt. Clemens Pottery Co.*, the Supreme Court held that FLSA defendants should not benefit from the evidentiary complications that result from their own record-keeping failures, because it "'would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.'" 328 U.S. at 688 (quoting *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 563 (1931)). Faced with inadequate employer records of hours worked, the *Anderson* court noted that it is the employer who has the "duty . . . to keep proper records of wages, hours and other conditions," while "[e]mployees seldom keep such records themselves." 328 U.S. at 687.

In the absence of proper employer records, employees enjoy a lenient burden of proof.

> [W]here the employer's records are inaccurate or inadequate . . . [t]he solution . . . is not to penalize the employee

> by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work . . . . [A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference . . . . [T]he court may then award damages to the employee, even though the result be only approximate. The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records . . . . It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.

328 U.S. at 687-88.  Accordingly, in a case involving off-the-clock work, once an employee establishes (a) a basic prima facie case that he or she was not paid for all compensable time worked, and (b) that the employer's records do not accurately record all hours worked, then the burden shifts to the employer to prove either (1) the actual hours worked (since they have no records, this is a daunting task) or (2) that the employee's testimony regarding the magnitude of uncompensated time worked is not credible.  *See Anderson*, supra; 29 C.F.R. §§ 516, 516.2 (required showings in non-records cases).

According to the Sixth Circuit, if the plaintiff produces sufficient evidence to establish the amount and "extent of that work as a matter of just and reasonable inference," then the "burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Herman v. Palo Group Foster Home*, 183 F.3d 468, 472 (6th Cir. 1999) (internal quotation marks omitted); *U.S. Dep't of Labor v. Cole Enters.*, 62 F.3d 775, 779 (6th Cir. 1995).  Moreover, where defendants have violated their duty to keep records that could show damages, plaintiffs receive the benefit of the doubt as to the proper approximations. Courts will uphold "somewhat generous" damages

36

approximations in such circumstances, because the need to make the approximation "simply points out the difficulty of precisely determining damages when the employer has failed to keep adequate records." *Reich v. S. New England Telecom. Corp.*, 121 F.3d 58, 70 n.3 (2d Cir. 1997).

     **C.**     **Plaintiffs Lacy and Syx Are "Employees" Within the Meaning of the Fair Labor Standards Act.**

     The statutory definition section of the FLSA is notable for how broadly it defines "employee":

> As used in this chapter–
>
> (e)(1) Except as provided in paragraphs (2)[public office holders and their appointees], (3)[immediate family of farmers], and (4)[individuals who volunteer with the government], the term "employee" means any individual employed by an employer.

29 U.S.C. § 203.  The FLSA defines "employee" in "exceedingly broad" terms.  *See Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 295 (1985). The Supreme Court has noted that there are limitations to the Act's breadth, giving as an example "[a]n individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit,' is outside the sweep of the Act." *Id.* (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947)). Thus, "[t]he test for employment under the Act is one of economic reality," *Id.* at 301, whether the persons in question undertook the covered activities "in expectation of compensation." *Id.* at 302.

     Here, Defendants admitted that Plaintiffs were employees within the meaning of the FLSA. (Doc. 57, Second Am. Compl. ¶¶ 4, 6; Doc. 58, Answer to Second Am. Compl. ¶¶ 4, 6). Specifically, Plaintiff Lacy worked for Reddy electric from 2009 through 2010, and Plaintiff

Syx worked for Reddy Electric from 2010 until 2011. (*Id. See also* Doc. 60, Jordan Dep. Exs. 9, 16.) Therefore, Plaintiffs are "employees" within the meaning of the FLSA and, as such, are afforded its protections and remedies.[20]

### D. Defendants Reddy Electric and Jeffrey Eldridge Are Both "Employers" Within the Meaning of the Fair Labor Standards Act and Are Subject to FLSA's Requirements.

"'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). "'Person' means an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U.S.C. § 203(a). The Supreme Court has characterized this definition of employer as "expansive." *Falk v. Brennan*, 414 U.S. 190, 195 (1973). *See also Lopez v. Silverman,* 14 F. Supp.2d 405, 411 (S.D.N.Y. 1998) (collecting authority on the expansiveness of the FLSA's definition of employer).

"The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991) (citing *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir. 1983)). In *Dole*, the Sixth Circuit observed:

> In *Agnew*, the court determined that "corporate officers with a significant ownership interest who had operational control of significant aspects of the corporation's day to day functions, including compensation of employees, and who personally made decisions to continue operations despite financial

[20] To be sure, to receive the greatest recovery, assuming violations are found, Plaintiffs will elect their remedies for overtime violations under the FLSA (liquidated damages) and for minimum wage violations under Article II, Section 34a of Ohio's Constitution (treble damages). To be sure, Article II, Section 34a of Ohio's Constitution uses the same definitions of "employee" and "employer" as the FLSA. As such, a determination that each Plaintiff is an "employee" and each Defendant is an "employer" under the FLSA is likewise a determination under Ohio's Constitution.

38

adversity during the period of non-payment" were employers
under the FLSA.

*Dole,* 942 F.2d at 965 (citing *Agnew,* 712 F.2d at 1514).  Similarly, the Second Circuit has

identified at least four factors relevant to the determination of whether an individual

qualifies as an employer for FLSA purposes: (1) whether the individual had the power to

hire and fire employees; (2) whether the individual supervised and controlled employee

work schedules or conditions of employment; (3) whether the individual determined the

rate and method of payment; and (4) whether the individual maintained employment

records. *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).  None of these

factors is alone dispositive, and, in reaching a determination, "the overarching concern is

whether the alleged employer possessed the power to control the workers in question."

*Herman*, 172 F.3d at 139; *see also Dole*, 942 F.2d at 965.

Defendant Reddy Electric admittedly is an employer within the meaning of the FLSA.

(Doc. 60, Jordan Dep. Ex. 22, Response to Req. for Admission No. 1.)  And although

Defendants denied the statement in both the applicable portion of the Second Amended

Complaint, and the applicable request for admission, Defendant Eldridge himself, at his

deposition, personally admitted all facts necessary for this Court to determine that he is an

"employer" within the meaning of the FLSA.  Specifically, Eldridge is part owner of and the

Vice President of Reddy Electric.  (Doc. 61, Eldridge Dep., pp. 7-8.) He has a role in business

development, human resources, and dealing with Reddy Electric's manpower in the field.

(*Id.*) Also relevant to these proceedings and to Mr. Eldridge's status as an "employer" under

the FLSA, he admitted that he (1) had the power to hire and fire employees; (2) supervised

employee work schedules; (3) supervised conditions of employment; (4) determined the

rate of pay for the employees; (5) is involved in the day-to-day operations of the Company;

(6) supervised employee tasks; (7) evaluated the employees' performances; and (8) directed the way employees perform the functions of their job. (*Id.*)

Therefore, both Reddy Electric and Jeffrey Eldridge are "employers" within the meaning of the FLSA. As such, Defendants must adhere to its requirements and are subject to the remedies proscribed therein in the event of non-compliance.

### E.      Defendants Utilize an Unlawful Time-Rounding Policy.

The Department of Labor ("DOL") exercised its rule-making authority delegated to it by Congress to establish the parameters of a permissible time-rounding policy. In 29 C.F.R. § 785.48, the Department of Labor set forth the following rules pertaining to time-rounding policies:

> (a) Differences between clock records and actual hours worked. Time clocks are not required. In those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work. Their early or late clock punching may be disregarded. Minor differences between the clock records and actual hours worked cannot ordinarily be avoided, but major discrepancies should be discouraged since they raise a doubt as to the accuracy of the records of the hours actually worked.
>
> (b) "Rounding" practices. It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

29 C.F.R. § 785.48(b). Courts that have interpreted this regulation have recognized that the

regulation permits employers to use a rounding policy for recording and compensating employee time as long as the time-rounding policy does not utilize intervals in excess of 15 minutes and the employer's rounding policy does not "consistently result[] in a failure to pay employees for time worked." *Eddings v. Health Net, Inc.,* No. CV 10-1744-JST, 2012 U.S. Dist. LEXIS 51158, at *10-13 (C.D. Cal. Mar. 23, 2012) (citing *Sloan v. Renzenberger, Inc.*, No. 10-2508-CM-JPO, 2011 U.S. Dist. LEXIS 41018, at *3 (D. Kan. Apr. 15, 2011)).

To be more specific, an employer's rounding practices comply with § 785.48(b) if the employer applies a consistent rounding policy that, on average, favors neither overpayment nor underpayment. *East v. Bullock's, Inc.*, 34 F. Supp. 2d 1176, 1184 (D. Ariz. 1998) (granting summary judgment in employer's favor where "evidence show[ed] that [employer's] rounding system may not credit employees for all the time actually worked, but it also credits employees for time not actually worked" so that the employer's "rounding practices average[d] out sufficiently to comply with § 785.48(b)"); *see also Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 U.S. Dist. LEXIS 68942, at *11 (E.D. Wis. Sept. 11, 2008) (approving policy where there was no evidence to suggest it systematically favored employer); *Contini v. United Trophy Mfg.*, No. 6:06-cv-432-Orl-18UAM, 2007 U.S. Dist. LEXIS 42510, 2007 WL 1696030, at *3 (M.D. Fla. June 12, 2007) (granting employer's motion for summary judgment where the "[employer], throughout [the employee's] employment, [used] a consistent policy as to the rounding of clocking-in and clocking-out, which [was] both fair and evenly applied to all employees.").

Conversely, an employer's rounding practices violate § 785.48(b) if they systematically under-compensate employees. *See, e.g., Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804, 820 (N.D. Ill. 2010) (time rounding and log-out policies may violate FLSA if they

"cause[] plaintiffs to work unpaid overtime"); *Austin v. Amazon.com, Inc.*, No. C09-1679JLR, 2010 U.S. Dist. LEXIS 45623, 2010 WL 1875811, at *3 (W.D. Wash. May 10, 2010) (denying defendant's motion to dismiss where policy "allows rounding when it benefits the employer without disciplining the employee; but disciplines the employee when the rounding does not work to the employer's advantage"); *Eyles v. Uline, Inc.*, No. 4:08-CV-577-A, 2009 WL 2868447, at *4 (N.D. Tex. Sept. 4, 2009) (granting summary judgment for plaintiff where defendant's rounding policy "encompasses only rounding down"); *Chao v. Self Pride, Inc.*, No. Civ. RDB 03-3409, 2005 U.S. Dist. LEXIS 11653, 2005 WL 1400740, at *6 (D. Md. June 14, 2005) (ruling that employer's practice of rounding employee time down violated FLSA).

The Court considers both whether the policy is facially neutral and whether the policy as applied results in the systematic under-compensation of employees, keeping in mind that the ultimate inquiry is whether the rounding system, over a period of time, "compensate[s] employees properly for all the time they have actually worked." *Eddings* , 2012 U.S. Dist. LEXIS 51158, at *10-13 (citing *Alonzo v. Maximus, Inc.*, F. Supp. 2d, 2011 U.S. Dist. LEXIS 150265, 2011 WL 6396444, at *4 (C.D. Cal. Dec. 5, 2011).

### 1.    *Defendant's Time-Rounding Policy Is Unlawful on Its Face.*

Defendants undoubtedly utilize a *per se* unlawful time-rounding policy that rounds time in excess of the fifteen-minute maximum intervals.  As an initial matter, Julie Jordan testified as follows:

> Q. Okay.  So I believe we talked about this earlier, but employees are paid from the time they clock in until the time they clock out?
> **A.  Correct.**
> Q. Okay.  So by default, that's considered payable time, according to the company's policies?

A. **Correct.**

(Doc. 60, Jordan Dep., p. 95.)  As such, and despite Defendants' arguments to the contrary, all time exhibited on Plaintiffs' time cards is considered working time under Reddy Electric's policies.  After being confronted with documentation, Jordan admitted that Reddy Electric used a half-hour time-rounding policy instead of a lawful fifteen-minute time-rounding policy.  Initially, Ms Jordan testified that Defendants used a time-rounding policy that rounded clock-in and clock-out time to the nearest fifteen-minute interval.  (*Id.*, p. 85.) But after being confronted with Plaintiffs' Lacy's clock-in and clock-out report, Exhibit 9 to the Jordan deposition, she conceded that the Defendants actually used an unlawful, thirty-minute time-rounding policy. (*Id.*, pp. 88, 89.)

And, reviewing those DataMAX timecards, there can be no doubt that Reddy Electric's time-rounding policy is in excess of that which is permitted by law.  In fact, during the deposition, Jordan admitted as much.  She testified as follows:

> Q. Okay.  Let's skip ahead to page [REC]00143.  If we go down four lines to November 10, 2009, here, we have a clock time of 3.82, a regular time of 3.5.  So shouldn't that have rounded up to four hours if it's going by quarter hour increments?
> **A.  I guess.  I said quarter.  It must be half hours.  I don't know.  That might have been an error.  I did say quarter.  I guess I would have to verify that.  But I believe – I know it rounds, so --**
> Q. So it's either a quarter hour or it may be a half hour rounding time?
> **A.  Yeah.  I would have to verify that.**
>
> * * *
> Q. So if it were a quarter of an hour rounding time, you would agree that Lacy should have been paid for four hours on November 10, 2009, for the afternoon portion of the day?
> **A.  Yes.**
> Q. And if it's a half hour, then no?
> **A.  Yes.**

Q.  Let's go over to 12-2, the next page, page 144, and talk about December 2, 2009.  In the afternoon there, we have the 3.8 hours of clock time and it was rounded down to 3.5.  If we are talking about quarter hours, that should have gone the other way, correct?
**A.  Correct.**

* * *

Q.   And just to -- one last one for an example there, I guess, is page 0145, at the very top, December 7, 2009, the clock time is 4:23 and it gets rounded down to 4.

**A.  Yeah, even though it doesn't show a lunch hour, that's -- I mean --**
Q.  The next one down we have is the afternoon time?
**A.  Yeah.**
Q.  So that's just morning.  It wouldn't have a lunch time taken out, right?
**A.   Well, I would have to check because, even though his clock says shop time, he may have been actually out on the road and they may have done an automatic lunch for him because they always stopped and ate their lunches.  But I would have to --**
Q.   You would look at the first two here, that says 7:26 to 11:40 and then he's clocking out and then clocks back in at 12:38, and that that takes into consideration the lunch?
**A.  Yes.**
Q.  So lunch doesn't explain this?
**A.   Yes, that's true.  I don't know about that one.  I don't know.**

(*Id.*, p. 88-91.)  Therefore, based upon both Julie Jordan's testimony and Reddy Electric's

own documentation, there is no question of material fact as to whether Defendants have, in

fact, utilized an unlawful, thirty-minute time-rounding policy.   As such, Plaintiffs are

entitled to summary judgment.

> **2.  *Even if Defendant's Time-Rounding Policy Is Not Unlawful on Its Face, Its Operation Renders It Unlawful Because Over a Period of Time, The Policy Does Not Pay Plaintiffs for All Hours Worked.***

Even if the policy itself were not unlawful on its face, it is in practice.  Indeed,

Defendants' time-rounding policy resulted in the systemic underpayment of their

44

employees.  Looking at each of Plaintiffs' individual timecard reports, it becomes apparent that the system was flawed and prejudiced toward under-compensation.  And Reddy Electric's representative admitted as much during her deposition.

To be sure, Exhibits 9 and 16 introduced during Julie Jordan's deposition are the DataMAX timecards for Lacy and Syx, respectively.[21]  Evaluation of this claim requires a review of these documents in their totality focusing on the "Clock Time," "Lunch Time" deduction, and "Total Time" columns.  Ms. Jordan admitted to the method by which this analysis should occur.  (Doc. 60, Jordan Dep., p. 100.)  By way of an example of what these timecards indicate, as to Lacy's timecard report for the week of November 9, 2009, Jordan agreed that Lacy should have been paid for 0.9 hours that he was not paid for.[22]  (*Id.*, pp. 97-98.)  During another week, Jordan admitted that Lacy should have been, but was not, paid for 1.1 hours of work due to the Defendants' time-rounding policy.[23]  (*Id.*, pp. 98-99.)

---

[21] Exhibits 9 and 16 should be examined in conjunction with Exhibits 5 and 12, which are earnings-and-deductions reports for Lacy and Syx, respectively.

[22] Ms. Jordan testified:

> Q.   So the week of November 9, 2009, to November 13, 2009, Lacy's clock-in time included .9 hours more than he was actually paid for that week?
> **A.   Possibly, yes.**
> Q.   Yes or possible?  Yes?
> **A.   I would have to look at his check for that week.**
> Q.   All right.  Well, let's go back to Exhibit 5, I think.
> **A.   Yes, he could have been paid.**
> Q.   He should have been paid?
> **A.   Should have been paid.**

(Doc. 60, Jordan Dep., pp. 97-98.)

[23] Indeed, Ms. Jordan testified:

> Q.   So page 0148, let's do the same thing with this week.  How much time was he clocked in for that he was not paid for this week?  There's actually a column listed at the bottom.
> **A.   One hour and six minutes.**
> Q.   Do you want to compare that with Exhibit 5, which is the payroll?
> **A.   He was paid for 40.**

45

And Jordan admitted that in the week of February 22, 2010, through February 26, 2010, Lacy should have been, but was not paid for a total of 1.33 hours of work due to the Defendants' time-rounding policy.[24] (*Id.*, p. 99.)  Likewise, Syx's time card reports, while not showing the dramatic underpayments per workweek, still demonstrate an overwhelming majority of weeks where Defendants profited while Syx suffered as a result of the Defendants' time-rounding policy.

Accordingly, Plaintiffs request this Court issue summary judgment in their favor and request the Court to rule that Defendants' time-rounding policy, as applied, resulted in the systematic under-compensation of Reddy Electric's employees.

> ### 3.     There Is No *De Minimis* *Exception to Excuse Non-Payment in the Context of Unpaid Time Resulting from Unlawful Rounding Policies.*

In *Eddings*, the employer argued that even if its rounding policy were unlawful, it should nevertheless be entitled to summary judgment because any uncompensated time was *de minimis*.  2012 U.S. Dist. LEXIS 51158, at *17-19.  In evaluating, and then flatly rejecting the employer's argument, the Court wrote,

---

> Q.   And so in the week of January 1, 2010 through January 25, 2010, Lacy was clocked in for 41.6 hours, he was paid for 40, so there was 1.06 hours that he was not paid for that week; you would agree?
> **A.  Yes.**

(*Id.*, pp. 98-99.)
[24] Ms. Jordan testified:

> Q.   Let's do one more of these.  Go to 0150.  How much time during the week of February 22, 2010, through February 26, 2010, was Lacy clocked in for but not included in his regular time?
> **A.  It says 41.33**.
> Q.  And how much was he paid for that week?
> **A.  It shows 40.**
> Q.  So there's 1.33 hours that he was clocked in but not paid for?
> **A.  Yes.**

(*Id.*, p. 99.)

> Defendant does not cite any case in which a court has applied the de minimis exception when time is rounded away due to a rounding policy, particularly when employees record their exact time and it is that precise time that is then made imprecise through rounding. In fact, as Defendant itself quotes, courts apply the de minimis exception because of the "realities of the industrial world." *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984). Here, the reality is that the Defendant had a record of exact time and then used a rounded time for purposes of compensation. The de minimis exception is not a broad rule granting employees some number of free minutes of labor per day. The circumstances here are simply not those contemplated by the de minimis exception.

*Id.* Just as the Court in *Eddings* recognized, the *de minimis* exception was meant to address the impracticality of recording small amounts of time. It was not meant to render otherwise recorded time as non-compensable because the employer, through its unilateral, unannounced policy, reduces the number of paid hours after obtaining actual on-the-clock time hours. Here, Plaintiffs' time was recorded daily, from the minute they clocked in to the moment they clocked out.[25] Yet the Company by operation of its rounding policy— which as discussed above was *per se* unlawful—stole otherwise compensable time from its employees. Therefore, this Court should rule that the *de minimis* exemption is inapplicable to Plaintiffs' claims concerning underpayments related to the operation of Company's time-rounding policy.

### F. Defendants Refused to Include Plaintiffs' Compensable Work Spent Driving and Riding in Company Vehicles for Purposes of Determining Plaintiffs' Hours Worked in Any Given Work Week, Which Results in Underpayments Under the Fair Labor Standards Act.

As a general matter, travel from home to work and back is not compensable. 29 U.S.C. § 254(a); 29 C.F.R. § 785.35. But even Defendants cannot reasonably dispute that

---

[25] That is not to say, however, that Plaintiffs are not seeking compensation for hours they worked performing various other tasks before clocking in and after clocking out, as asserted elsewhere in this motion.

some work-related travel time is compensable. For instance, if employees must initially report to one location, such as the employer's dispatching center, to receive assignments, and then must proceed to travel to other job locations, the time spent traveling from the initial place the employee reported to other job locations is compensable. See 29 C.F.R. § 785.38; *Preston v. Settle Down Enterprises, Inc.*, 90 F. Supp. 2d 1267 (N.D. Ga. 2000); *Dole v. Enduro Plumbing, Inc.*, No. 88-7041-RMT (KX), 1990 U.S. Dist. LEXIS 20135 (C.D. Cal. Oct. 16, 1990). Further, if travel time includes any duties performed on behalf of the employer or otherwise is for the employer's benefit, then the time should be compensable. *See Baker v. Barnard Constr. Co.*, 146 F.3d 1214 (10th Cir. 1998). As such, Defendants' expected cursory attempt to classify Plaintiffs' claims as non-compensable merely because they are related to traveling inside a vehicle should be disregarded, and a more thorough analysis is warranted.

Plaintiffs' claims related to time spent inside Defendants' company vehicles are best understood as two separate and distinct analyses. The first line of analysis centers on time either Plaintiff spent driving a company vehicle to or from a project site while transporting not only himself, but also other Company employees, Company equipment, Company tools, or Company materials. The second line of analysis centers on time spent in a Company vehicle being transported to or from a project site while within otherwise compensable time pursuant to the continuous workday rule and the aggregation doctrine.

### 1. Plaintiffs Are Entitled to Compensation for Time Spent Driving Company Vehicles to or from Project Sites While Transporting Other Company Employees, Company Equipment, Company Tools, or Company Materials.

Under the Portal-to-Portal Act, 29 U.S.C. §§ 251-262, it is settled law that driving from an employer's shop to job sites is compensable as a principal activity when the driver

is transporting tools, supplies, materials, or employees without which the employer could not be constructing buildings. In *Herman v. Rich Kramer Construction, Inc.*, No. 97-4308WMS, 1998 U.S. App. LEXIS 23329 (8th Cir. Mo. Sept. 21, 1998), the company contended that the PPA exempted the foremen's travel time. The Eighth Circuit, however, ruled "that driving to job sites was compensable as a principal activity because [the company] could not have constructed buildings without the tools, supplies, and employees transported by foremen." *Rich Kramer Constr.*, 1998 U.S. App. LEXIS 23329, at*4 (citing *Secretary v. E.R. Field, Inc.*, 495 F.2d 749, 751 (1st Cir. 1974)). The Court further exclaimed that "[a]lthough providing trucks may have been convenient for the foremen, it also benefited Kramer." *Rich Kramer Constr.*, 1998 U.S. App. LEXIS 23329, at *4 (noting that an activity is compensable if done partially for employer's benefit, even if the employee also benefits). The *Rich Kramer* court even provided an alternative basis for its conclusion that the foreman's travel time from the shop to jobsites was compensable. Specifically, based upon the language of 29 CFR § 758.38 and *Enduro Plumbing, Inc., 1990 U.S. Dist. LEXIS 20135*, the Court ruled that travel time "was compensable because the work day began when foremen reported to the shop" because the foremen were picking up employees and tools to bring to the job site." *Rich Kramer Const.*, 1998 U.S. App. LEXIS 23329, at*4-5.

Similarly, the United States District Court for the District of Idaho held that employees driving vans and busses full of employees from some set place to a jobsite was compensable work. In *Hodge v. Lear Siegler Services, Inc.* No. CV 06-263-MHW, 2008 U.S. Dist. LEXIS 45128 (D. Idaho June 9, 2008), the plaintiffs argued that that class members should have been compensated for driving company vans and busses full of other employees from their housing units to the work site, commuting time as passengers on

49

those same vans and busses, and for off the clock and overtime work in addition to their standard work week. *Id.,* at *3-4. In evaluating whether time spent in the vans and busses was compensable, the district court wrote,

> The concept of "work" relates specifically to the tasks done at the direction of the employer and for the employer's economic benefit such that time spent commuting as a passenger under the facts of this case is not ordinarily understood as "work." On the other hand, as previously discussed, the drivers of the vans and busses were doing a task at the direction of their employer and for the employer's economic benefit. The plain meaning of "work" would, therefore, encompass driving vans and busses at the employer's request, especially considering that LSI compensated drivers by the use of flex-time after March 2006.

*Lear Siegler Services*, 2008 U.S. Dist. LEXIS 45128, at *21-22. The district then applied this rationale directly to the potential application of the PPA. In doing so, the Court held as follows:

> As for those employees asked to volunteer to drive company busses and vans, the Court has already concluded under the facts of this case that driving constituted "work" under the terms of the Employment Agreement, and it will not analyze this subgroup separately by analogy to the PPA.

*Id.*, at *31.

Here, there can be no genuine dispute that each Plaintiff had driven a Company vehicle containing employees, tools, equipment, and materials to or from a job site.[26] First, the Company failed to maintain any records of the time either Plaintiff spent driving company vehicles. (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission Nos. 5, 8,

---

[26] Plaintiffs acknowledge the fact that the exact number of times either Plaintiff drove a Company vehicle containing employees, tools, equipment, or materials remains a question of fact, which is to be resolved by the trier of fact in these proceedings. However, even though the number of total hours spent performing these compensable tasks remains in dispute, the record has made clear that Plaintiffs have in fact performed these functions without compensation, and as such, are entitled to summary judgment as to the occurrence of a violation, even if the amount of back pay to be awarded must await a determination from the trier of fact.

13, 16.)  As such, Plaintiffs are entitled to the inferences, presumptions, and burden-shift adopted by the Sixth Circuit in such cases.  *See Palo Group Foster Home*, 183 F.3d at 472.

As to Lacy, Defendants admitted all necessary facts for the Court to find that Defendants violated the FLSA regarding time he spent driving a Company vehicle.  They admitted Lacy "sometimes drove a company vehicle from the shop to the jobsite, that on some occasions another employee was a passenger and that from time to time small amounts of material w[ere] transported in the vehicle." (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission No. 3.) Defendants also admitted Lacy "sometimes dr[o]ve a company vehicle from the job site to the shop, that on some occasions another employee was a passenger and that from time to time small amounts of material was transported in the vehicle." (*Id.,* Response to Req. for Admission No. 6.)  In fact, Defendants conceded they failed to pay Lacy "for the period before he signed in and began his work shift or after he signed out at the end of his shift." (*Id.,* Response to Req. for Admission Nos. 4, 7.)  Therefore, as to Lacy, Defendants violated the FLSA by failing to include hours spent driving a Company vehicle while transporting employees, materials, tools, or equipment between the Company's shop in Xenia, Ohio to various jobsites.

Similarly, there is no dispute that Syx drove the Company van at least once because Defendant Eldridge received complaints from other employees that they did not want Syx to continue driving because he was supposedly a bad driver.  (Doc. 61, Eldridge Dep., pp. 50-51.)   But even if he had not conceded that fact, Syx's testimony clearly establishes, without regard to any dispute concerning the numbers of hours spent doing so, that Syx did in fact drive the Company van or Company car, or both, to and from jobsites.  And the Company conceded, and Syx confirmed, that Syx was not paid for any time he spent driving

a Company vehicle. (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission Nos. 12, 15.) Therefore, as to Syx, Defendants violated the FLSA by failing to include hours spent driving a Company vehicle while transporting employees, materials, tools, or equipment between the Company's shop in Xenia, Ohio and various jobsites.

Defendants contend this time is not compensable because Plaintiffs drove the Company vehicles voluntarily, for their own convenience, and, in part, for their own interest in saving commuting costs. But, as presented above, Defendants' precise argument has been rejected by several courts because it is undeniably in an employer's economic benefit to have its employees, materials, tools, and equipment brought to any given construction jobsite. The fact is, without these items, the Company could not complete its projects. Simply to illustrate the point, Defendants' argument could succeed in the event that Lacy or Syx merely drove himself in the Company vehicle, without transporting employees, various materials, supplies, and equipment to and from the jobsites. But the undisputed facts demonstrate otherwise. Accordingly, the Defendants should not be permitted an economic windfall—and, perhaps, a competitive advantage over other employers who follow the FLSA—by benefitting from their employees' work without having to pay for it, even where an employee also benefits. *Rich Kramer Constr.*, 1998 U.S. App. LEXIS 23329, at*4**.**

Furthermore, Defendants' authorities are off the mark and they do not even address the specific situation here regarding the *Company-vehicle driver*'s claim for payment. For instance, in *Knight v. Allstar Bldg. Materials, Inc.*, No. 6:08-cv-457-Orl-22DAB, 2009 U.S. Dist. LEXIS 107247 (M.D. Fla. Sept. 30, 2009), the Plaintiff was *a passenger* in the Company vehicle and "the only purported 'loading' he was required to do was to move tools or other

supplies such as caulk or screws from the cab of the pickup or box truck to the back of the truck, presumably so that he could sit in the cab." *Id.* In this regard, the Court expressly noted the plaintiff's supervisor was the driver and the supplies were already in the vehicle when the driver stopped to pick the plaintiff up. *Id.* at *16-17. And in *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274 (10th Cir. 2006), the plaintiffs were, again, *passengers* in the vehicles being driven to the job site, and the only "equipment" the plaintiffs transported were their "hard hats, gloves, steel-toed boots, and coverall clothing." *Id.* at 1288-89.

As such, Defendants were required to pay Lacy and Syx for hours worked driving the Company vehicle between the shop and the jobsite while transporting Defendants' employees, equipment, tools, or materials. Therefore, Plaintiffs request that summary judgment be issued in their favor and against Defendants, as follows:

> That under the Fair Labor Standards Act, any time that either Plaintiff spent *operating* Company motor vehicles while transporting employees, equipment, materials, or tools either from the Company's shop in Xenia to a jobsite or from a jobsite to the Company's shop in Xenia must be considered hours worked for purposes of determining whether either Plaintiff was not compensated for all hours worked in a workweek; and

> That the Defendants violated the Fair Labor Standards Act by not including time spent *operating* Company motor vehicles while transporting employees, equipment, materials, or tools either from the Company's shop in Xenia to a jobsite or from a jobsite to the Company's shop in Xenia as compensable work and compensating Plaintiffs for those hours worked.

### 2. Plaintiffs Are Entitled to Compensation for Time Each Spent Riding in Company Vehicles to or from Project Sites When Such Time Is Compensable Under the Continuous Workday Rule.

The Supreme Court recently reaffirmed the continuous workday rule when it wrote, "consistent with our prior decisions interpreting the FLSA, the Department of Labor has adopted the continuous workday rule, which means that the 'workday' is generally defined

as 'the period between the commencement and completion on the same workday of an employee's principal activity or activities.'" *Alvarez*, 546 U.S. at 29 citing 29 C.F.R. § 790.6(b).  Furthermore, the PPA has no implication on the application of the continuous workday rule to any given case.  Specifically, the regulations provide:

> [T]o the extent that activities engaged in by an employee occur after the employee commences to perform the first principal activity on a particular workday and before he ceases the performance of the last principal activity on a particular workday, the provisions of [§ 4] have no application.

29 CFR § 790.6(a).

> a.  The Time Plaintiffs Spent Loading or Unloading Company Vehicles Prior to or After Riding In Company Vehicles Triggers Application of the Continuous Workday Rule, Making the Ride in the Company Vehicle Compensable.

In *Ross v. Wolf Fire Prot., Inc.*, 799 F. Supp. 2d 518 (D. Md. 2011), the defendants sought judgment and dismissal, arguing "the Plaintiffs' 'voluntary carpooling' while 'transporting tools, equipment and supplies' is not compensable under the FLSA." *Id.* at 524-25.  The plaintiffs argued that because their workday started with loading the trucks at the warehouse, they must be compensated for all subsequent travel time within the workday.  *Id.*  In rejecting the defendants' argument, the district court specifically recognized "[t]he Portal-to-Portal Act did not change the 'continuous workday' rule that 'any walking, riding, or traveling time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity . . . is covered by the FLSA.'" *Id.*

Importantly, when shop activities are an indispensable part of an employee's principal activities, the shop time is compensable. Examples of activities that are integral to principal activities include reporting to a designated meeting place, receiving assignments,

and loading equipment. *See Rich Kramer Constr.*, 1998 U.S. App. LEXIS 23329, at *7 (holding that the shop time was compensable when an employer required employees to report to a shop); *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 400 (5th Cir. 1976) (holding that an electrician's pre-work activities of preparing supply requests, loading trucks, and cleaning equipment are an integral part of an employee's principal activities); *Hodgson v. Frisch's Dixie, Inc.*, No. 6641, 1971 U.S. Dist. LEXIS 12029, at *11 (W.D. Ky. Aug. 16, 1971) (concluding that cleaning equipment and preparing for the next day were compensable activities), *aff'd*, 469 F.2d 82 (6thCir.1972) (per curiam); *O'Brien v. Encotech Constr.*, No. 00-CV-1133, 2004 U.S. Dist. LEXIS 4696, at *17 (N.D. Ill. Mar. 23, 2004) (holding that gathering tools, supplies, water, and paperwork were integral activities that benefitted the employer and were integral to principal activities); *Enduro Plumbing*, 1990 U.S. Dist. LEXIS 20135, at *12, 14 (holding that plumbers' activities of meeting workers, collecting tools, and traveling in company-owned trucks were compensable). *See also* 29 C.F.R. § 790.7(c).

Furthermore, travel that is an indispensable part of performing one's job is principal activity and is compensable as hours worked.

> Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice.

29 C.F.R. § 785.38. Once an employer suffers or permits employees to report to a designated meeting place, such as the shop, travel time to jobs sites are part of a day's work and compensable under the FLSA. *See Rich Kramer Constr.,* 1998 LEXIS 23329, at *4, 7; *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2004 U.S. Dist. LEXIS 16288, at **21-22 (N.D. Ill. Aug. 18, 2004) (finding travel time from yard to job site compensable

55

when employees perform preparation work in the yard before going to the job site); *Encotech Constr.*, 2004 U.S. Dist. LEXIS 4696, at *14-15 (holding that travel time from the yard to the job site was compensable after the employees performed preparation activities in the yard); *Breen v. Concrete By Wagner, Inc.*, No. 98 C 3611, 1999 U.S. Dist. LEXIS 17401, at *37 (N.D. Ill. Nov. 4, 1999) (concluding that the employer violated the FLSA for failing to pay travel time from shop to job site and *vice versa* when the employer required employees to report to the shop).

Given this precedent, there is no doubt that when either Plaintiff began loading materials, equipment, or tools at the Company's shop prior to riding in a Company vehicle to a jobsite or unloaded materials at the shop after riding in a Company vehicle from a jobsite, the time spent loading and unloading and the drive time had to be included as hours worked in that workweek. Here, Plaintiffs recognize that there will likely be a factual dispute as to the number of times this occurred and, as such, are not seeking summary judgment on the precise amount of time spent or back pay owed. However, given the case law cited above and the undisputed facts that this occurred, at least on occasion, should support a finding of a violation at this time. To be sure, the Company failed to maintain any records of the time either Plaintiff spent performing these activities. (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission Nos. 5, 8, 13, 16.) As such, Plaintiffs are entitled to the inferences, presumptions, and burden-shift adopted by the Sixth Circuit in such cases. *See Palo Group Foster Home*, 183 F.3d at 472.

Lacy testified that, most of the time, he would load various materials, tools, or equipment into the truck at the shop prior to driving to the jobsite. Lacy would load pipe, conduit, boxes of couplings, gang boxes, anchor bolts, concrete blankets, and other boxes of

materials that would have arrived at the shop previously. (Doc. 27, Lacy Dep., p. 15.) Typically, it took Lacy at least ten minutes to complete these tasks. (*Id.*) Lacy also regularly brought supplies back to the shop from the Talawanda jobsite eighty to eighty-five percent of the time. (*Id.*, p. 18.) In such instances, on average, Lacy spent ten minutes unloading the supplies and materials from the truck and putting them where they belong. (*Id.*, p. 28.) Defendants admitted they did not pay Lacy for any of this time. (Doc. 60, Jordan Dep. Ex. 21, Response to Req. for Admission Nos. 4, 7.)

Syx testified that, once per week, he loaded equipment into the van prior to it departing. (Doc. 28, Syx Dep., pp. 9-10, 19.) This equipment included "wire, boxes, mud rings, basic material along those lines." (*Id.*, p. 10.) It would take Syx from five to fifteen minutes to load the vehicle. (*Id.*, pp. 10, 19.) Once every two weeks, Syx would also unload materials from the van at the shop. (*Id.*, p. 15.) Typically, he unloaded extra materials that were no longer needed on the project, such as devices, wire, boxes, and mud rings. (*Id.*) During those situations, it would take Syx, at most, ten minutes to unload the Company van. (*Id.*, pp. 16-17.) Syx further testified that, at the request of his foreman, on at least one occasion, he transported a truckload of materials from the Arcanum jobsite to the shop in his personal vehicle and unloaded it himself—all after having clocked out of work for the day. (*Id.*, pp. 12-13.) In that instance, it took Syx half an hour to unload the vehicle, and that was in addition to his hour and forty-five minute drive to the shop that afternoon. (*Id.*, p. 16.) The Company did not compensate him for any of that time. (*Id.*) The Defendants have conceded that point. (Doc. 60, Jordan Ex. 21, Response to Req. for Admission Nos. 12, 15.)

Therefore, Plaintiffs request the Court to issue summary judgment on the applicability of the continuous workday rule; that loading and unloading were part of

Plaintiffs' principal duties; that travel time after or before loading and unloading time was part of Plaintiffs' principal duties; and that Plaintiffs should have been compensated for all that time.

> b. The Time Plaintiffs Spent Loading or Unloading Company Vehicles Prior to or After Riding in Company Vehicles Was Not *De Minimis.*

Once it is determined that the loading and unloading time is a principal activity—triggering application of the continuous workday rule to the resulting drive time—the issue then becomes whether the time each employee spent loading and unloading materials at Reddy Electric's shop prior to being driven to the jobsite in a Company vehicle qualified as *de minimis* time. According to the *de minimis* doctrine, otherwise compensable time is not actionable under the FLSA if it is so trivially small that it cannot be recorded and has no real value—even in aggregate. "[A] few seconds or minutes of work beyond the scheduled working hours . . . may be disregarded. Split-second absurdities are not justified . . . ." *Mt. Clemens Pottery Co.*, 328 U.S. at 692. In order to determine whether time worked is *de minimis*, the following three factors are to be weighed: "(1) the practical administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate; and (3) whether 'the claimants performed the work on a regular basis.'" *Reich v. New York City Transit Authority*, 45 F.3d 646, 649-50 (2d Cir. 1995); *see also Reich v. Monfort, Inc.*, 144 F.3d 1329 (10th Cir.1998). "Employers . . . must compensate employees for even small amounts of daily time unless that time is so miniscule that it cannot, as an administrative matter, be recorded for payroll purposes." *Lindow v. United States*, 738 F.2d 1057 (9th Cir.1984).

In *Ross v. Wolf Fire Prot., Inc.*, 799 F. Supp. 2d 518, 523-524 (D. Md. 2011), the court was requested to determine whether the loading and unloading of equipment at the employer's shop prior to traveling to construction sites to install sprinkler systems was *de minimis*, thus exempting the time from being compensable.   There, the plaintiffs argued that loading and unloading equipment at the warehouse must be compensated as integral and indispensable to their principal activities because without the tools and equipment they would have been unable to install sprinkler systems at the construction sites. *Id.* On the other hand, the defendants argued that loading and unloading the equipment was not integral and indispensable, and regardless, it was not compensable under the FLSA because the process took only five to ten minutes. *Id.*  In ruling that the plaintiffs' time was not *de minimis*, the district court wrote,

> Although some courts have suggested that an activity is de minimis if it does not exceed 10 minutes, see *Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 (10th Cir. 1994), here the Plaintiffs' claims are based on daily trips to the warehouse to load and unload equipment. *See Singh v. City of New York*, 524 F.3d 361, 371 (2d Cir. 2008) ("whether the claimants performed the work on a regular basis" is one consideration in determining whether work was de minimis). Even if the Court accepted the 10 minute rule and the Defendants' assertion that loading the trucks took no more than 10 minutes, the aggregated time at issue exceeds 10 minutes, and the Defendants may not be granted summary judgment on the basis that the activity was de minimis. *Perez [v. Mountaire Farms*, 601 F. Supp. 2d 670, 683-84 (D. Md. 2009)].

*Ross*, 799 F. Supp. 2d at 524.

Here, each Plaintiff routinely loaded and unloaded Company vehicles at the Company's shop prior to the beginning and after the conclusion of their regularly paid workday.   There would be no administrative difficulty in the employees recording their time.  According to Defendant Eldridge, the Company has time clocks at the Company's

shop where employees could feasibly clock in upon arrival prior to traveling to a jobsite. (Doc. 61, Eldridge Dep., pp. 21-22.)  Therefore, but for the Company forbidding the practice, it could easily have been recorded.  Notably, because each Plaintiff *routinely* performed these tasks, in the aggregate, the claims are quite substantial.  While Plaintiffs recognize that there will likely be a material question of fact as to the precise number of total hours Plaintiffs spent loading and unloading the vehicles, Plaintiffs' testimony establishes that the *de minimis* doctrine in inapplicable.  Specifically, Plaintiff Lacy testified that he spent ten to fifteen minutes a day in the morning and ten minutes at the conclusion of the workday loading and unloading vehicles.  And Plaintiff Syx testified that he spent between five and fifteen minutes per day, twice per week, loading and unloading vehicles through his one-year tenure of employment with the Defendants. [27]  Therefore, in the aggregate, each Plaintiff's claims are not *de minimis*.

### G.     Upon the Finding Back Pay Is Owed to Plaintiffs, They Are Entitled to Liquidated (or Treble) Damages.

Section 216(b) of 29 U.S.C. provides that an employer who violates the minimum-compensation provisions of the Act is liable for the amount of the unpaid minimum wages or overtime compensation "and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The Sixth Circuit has characterized these damages as "compensation, not a penalty or punishment."   *Elwell v. Univ. Hosps. Home Care Servs.,* 276 F.3d 832, 849 (6th Cir. 2002).  And, the damages have even been classified by the Sixth Circuit as "mandatory." *Martin v. Indiana Michigan Power Company*, 381 F.3d 574, 585 (6th Cir. 2004).  Similarly, Ohio's Constitution provides for mandatory treble damages in the event a minimum-wage

---

[27] Syx's term of employment began June 7, 2010 and extended until June 16, 2011.  (Doc. 60, Jordan Dep., Ex. 10.)

violation is found.  Ohio Const., Art. II, § 34a ("Damages shall be calculated as an additional two times the amount of the back wages . . . .").

The FLSA grants district courts discretion not to award liquidated damages only where the employer "shows that the act or omission giving rise to [its violation] was in good faith and that he had reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260.  There is no good-faith exception to damages under the Ohio Constitution.  Under the FLSA, "the burden of establishing good faith for an employer is substantial,' . . . and a failure to comply with the provisions of the Act must be based on objectively reasonable grounds."  *Solis v. Min Fang Yang*, 345 F.Appx. 35, 39 (6th Cir. 2009) (quoting 29 U.S.C. § 260).  The defense requires plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it. *See Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984); *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468-69 (5th Cir. 1979). The burden is a difficult one to meet, however, and "double damages are the norm, single damages the exception. . . ." *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986).

Here, Defendants can present no admissible evidence in these proceedings demonstrating that there is even an arguable question whether they took any steps to determine the legality of their practices.  As such, based upon the foregoing, Plaintiffs request the Court to issue summary judgment on the issue that, in the event back pay is found to be due and owing as a result of Defendants' violations of the FLSA (and Ohio Constitution), Plaintiffs are entitled to liquidated (and treble) damages.

**H.     Upon Finding a Violation, an Award of Costs and Attorneys' Fees Is Mandatory.**

Under 29 U.S.C. § 216(b), "[t]he Court in [an FLSA] action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." Thus, where a judgment for unpaid wages and liquidated damages has been entered, a plaintiff's request for attorney's fees and costs must be granted.  The same is true under the Ohio Constitution: "Where an employer is found by the state or a court to have violated any provision of this section, the employer shall within thirty days of the finding pay . . . the employee's costs and reasonable attorney's fees."  Ohio Const., Art. II, § 34a.  An award of attorney's fees under FLSA § 16(b) is mandatory, but the amount awarded is within the discretion of the District Court. *Farmer v. Ottawa County*, No. 98-2321, 2000 U.S. App. LEXIS 7224, at *19-20 (6th Cir. Apr. 13, 2000) citing *United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Ass'n, Local 307  v. G & M Roofing and Sheet Metal Co. Inc.*, 732 F.2d 495, 501 (6th Cir. 1984). "Since the FLSA does not discuss what constitutes a reasonable attorney fee, determination of a reasonable fee must be reached through evaluation of a myriad of factors, all within the knowledge of trial court. . . ." *Fegley v. Higgins*, 19 F.3d 1126, 1134 (6th Cir. 1994).  But courts should be mindful that the purpose of the fee-shifting provision is to "insure effective access to the judicial process by providing attorney fees for prevailing plaintiffs with wage and hour grievances." *United Slate*, 732 F.2d at 502. "Courts should not place an undue emphasis on the amount of plaintiff's recovery because an award of attorney's fees . . . 'encourage[s] the vindication of congressionally identified policies and rights.'" *Fegley*, 19 F.3d at 1134-35.

Based on the foregoing, Plaintiffs request this Court to issue summary judgment finding that due to the previous violations found—and in the event additional violations are found at trial—that Plaintiffs are entitled to an award of attorneys' fees and costs.

**I.      Defendants Failed to Timely Respond to Plaintiff Lacy's Request for His Employment Records under the Ohio Constitution.**

The Ohio Constitution requires employers to maintain certain employment records. Ohio Const., Art. II, § 34a. These records include an employee's "name, address, occupation, pay rate, hours worked for each day worked, and each amount paid an employee for a period of not less than three years following the last date the employee was employed." *Id.* Section 34a further requires  an employer to provide wage-and-hour records to an employee upon request.  *Id.*  An employer must provide these records "without charge to an employee or person acting on behalf of an employee." *Id.*  The implementing legislation requires an employer to provide the wage-and-hour records within thirty days. R.C. 4111.14(G)(3). This requirement may be waived by agreement between the parties or if production within thirty days would cause a hardship on the employer. R.C. 4111.14(G)(3)(a) and (b).  In the event of a claimed hardship, the employer must provide the wage-and-hour records "as soon as practicable."   Furthermore, R.C. 4111.14(G) specifically states that:

> In accordance with Section 34a of Article II, Ohio Constitution, an employer must provide such information without charge to an employee or person acting on behalf of an employee upon request. As used in division (G) of this section:
>
> (1) "Such information" means the name, address, occupation, pay rate, hours worked for each day worked, and each amount paid for the specific employee who has requested that specific employee's own information and does not include the name, address, occupation, pay rate, hours worked for each day worked, or each amount paid of any other employee of the

> employer. "Such information" does not include hours worked for each day worked by individuals for whom an employer is not required to keep that information under the Fair Labor Standards Act and its regulations or individuals who are not subject to the overtime pay requirements specified in section 4111.03 of the Revised Code.

Finally, Section 34a is quite clear that costs and attorneys fees are awardable in successful actions to enforce *any* of Section 34a's provisions. Ohio Const., Art. II, § 34(a); *see also Pandey v. Rascal Unit, Ltd.*, No. 2:09-cv-550, 2010 U.S. Dist. LEXIS 54348 (S.D. Ohio Apr. 30, 2010) (awarding costs and attorney's fees after finding a violation of Section 34a's records production requirements). In *Pandey*, the Court wrote:

> Ohio's voters chose to amend the Ohio Constitution to add § 34a, including its provision which (as the Court previously found) requires employers to produce certain records to their employees upon request. Although, as Defendants state, Plaintiff "now has all of the information she requested either through defendants' Rule 26(f) report or discovery", it is now a matter of constitutional law in Ohio that employees should not be required to sue in order to obtain their employment records. Plaintiff requested her records, and did not receive them; § 34a provides that, since she was obligated to then sue for them, the losing defendant must pay reasonable attorney's fees. Whether or not this is a trivial matter, "intellectual exercise", or a "footnote irrelevant to the outcome of this lawsuit", the Court is obligated to honor and impose the penalty provided by the Ohio Constitution.

*Pandey v. Rascal Unit, Ltd.*, No. 2:09-cv-550, 2010 U.S. Dist. LEXIS 76687, at *3-4 (S.D. Ohio July 19, 2010). Therefore, if the Court finds that Plaintiff Lacy was entitled to his records and Defendants withheld those records, then Plaintiff Lacy is entitled to his costs and attorneys' fees incurred in enforcing his right to obtain the records.

Plaintiff Lacy was entitled to the requested information under Section 34a as an "employee." As previously stated, the Ohio Constitution borrows certain definitions from the FLSA" including those definitions for "employee," "employ," and "employer." Ohio

Const., Art. II, § 34(a).  In this regard, Section 34a states:

> As used in this section: "employer," "employee," "employ,"
> "person," and "independent contractor" have the same
> meanings as under the federal Fair Labor Standards Act or its
> successor law . . . .

As referenced above, Plaintiff Lacy is an "employee," and each Defendant is an "employer"

that "employed" Plaintiff Lacy.  Therefore, Lacy was entitled to his employment records

within the time proscribed by R.C. 4111.14(G)(3).

Here, there is no dispute that Defendants violated Section 34a and R.C.

4111.14(G)(3).  On January 7, 2011, Plaintiff served his letter by both facsimile and

electronic mail upon his supervisor and Vice President of Reddy Electric, Jeffrey Eldridge.

(Pls.' Mot. for Partial Summ. J. Ex. 1, Lacy Aff. ¶¶ 4-7, pp. 3-4; Doc. 60, Jordan Dep. Ex. 24.)  A

simple review of the correspondence demonstrates that the records Lacy sought were

within the realm of documentation that Defendants were required to both maintain and

produce upon request.  (*Compare* Lacy Aff. pp. 3-4 *and* Jordan Dep. Ex. 24 *with* Art. II,

Section 34a of Ohio's Constitution.) Specifically, Lacy sought his personnel file, earnings-

and-deductions reports, all employee handbooks, all documents that reflected his hours

worked, job descriptions, paystubs, and travel-time policies.  (*Id.*)

In 2006, Ohio's voters saw fit—through passage of the Minimum Wage

Amendment—to make wage-and-hour records readily available at no charge to an

employee. Access to the records allows an employee (or their representative) to properly

prepare for and evaluate wage-and-hour cases.  An employee should not have to file a

lawsuit alleging the failure to timely produce these records, amend their complaint seeking

these same records five months later, and be required to serve discovery requests in order

to obtain his wage-and-hour records.  But that is precisely what happened in this case.

(Pls.' Mot. for Partial Summ. J. Ex. 1, Lacy Aff. ¶¶ 7-13.)  Defendants did not provide responsive records until November 9, 2011, when they responded to Plaintiffs' requests for production of documents.  (Doc. 60, Jordan Dep., pp. 141, 143.)  In sum, Plaintiff Lacy had to wait over ten months to receive the records he requested before suit was filed.  And this is the exact situation Section 34a was designed to prevent.  *See Pandey v. Rascal Unit, Ltd.*, 2010 U.S. Dist. LEXIS 76687, at *3-4.  Defendants, thus, violated Ohio's Constitution by failing to provide Plaintiff Lacy with his employment records promptly.

Defendants may argue that discussing settlement or filing a lawsuit tolled Defendants' production requirement, which Lacy vigorously disputes. But, under the circumstances of this case, no reasonable fact-finder could conclude that some non-existent agreement by innuendo would still be in place after Plaintiff Lacy filed his original complaint on March 2, 2011.  (Pls.' Mot. for Partial Summ. J. Ex. 1, Lacy Aff. ¶¶ 8-10.)  At that point, Plaintiff alleged that Reddy Electric violated Section 34a by failing to tender the requested documentation.  (*Id.* ¶ 11.)  A reasonable person, under these circumstances, would have viewed any alleged agreement by innuendo to be terminated.  But Defendants still failed to produce the requested documents for another eight months after the initial complaint was filed.

To be sure, Plaintiff Lacy amended his complaint on June 6, 2011, and again, reasserted his Section 34a claim.  (*Id.* ¶ 12.)  Defendants still did nothing, waiting five more months, until after they were obligated to respond to discovery requests under the Federal Rules of Civil Procedure to comply with their Constitutional obligations.  (*Id.* ¶ 13.)  Therefore, no reasonable fact finder could conclude that there was an agreement—written, oral, or otherwise—between the parties that would have extended the required date for

production until November 9, 2011. Accordingly, this Court should enter summary judgment in favor of Plaintiff Lacy on his claim under Article II, Section 34a of the Ohio Constitution. After finding that violation, this Court should award Plaintiff his costs, including reasonable attorneys' fees, incurred in pursuing that claim.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs request that partial summary judgment be issued in their favor on the following issues:

a) That each Plaintiff is an "employee" within the meaning of the Fair Labor Standards Act and the Ohio Constitution;

b) That each Defendant is an "employer" within the meaning of the Fair Labor Standards Act and the Ohio Constitution;

c) That due to Defendants failing to maintain adequate records, the presumption established under *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) shall be in effect throughout the remainder of these proceedings and that Plaintiffs' recollection of hours worked shall be presumed correct;

d) That Defendants utilize an unlawful time-rounding policy in violation of 29 C.F.R. § 785.48(b);

e) That under the Fair Labor Standards Act, any time that either Plaintiff spent operating Company motor vehicles while transporting employees, equipment, materials, or tools either from the Company's shop in Xenia, Ohio to a job site or from a job site to the Company's shop in Xenia, Ohio must be considered hours of work for purposes of determining whether Plaintiffs were compensated for all hours worked in each workweek;

f) That the Defendants violated the Fair Labor Standards Act by not including time spent operating Company motor vehicles while transporting employees, equipment, materials, or tools either from the Company's shop in Xenia, Ohio to a job site or from a job site to the Company's shop in Xenia, Ohio as compensable work and by not compensating Plaintiffs for those hours worked;

g) That the continuous workday rule governs whether or not Defendants were required to include hours spent riding in Company vehicles after having loaded or prior to unloading Company tools, equipment, materials, or tools as hours worked for minimum-wage and overtime purposes;

h) That the Court will utilize the aggregation doctrine while evaluating whether the time Plaintiffs spent loading and unloading vehicles prior to or after traveling in Company vehicles was *de minimis* so as to preclude application of the continuous workday rule;

i) That, in the aggregate, the time Plaintiffs spent loading and unloading vehicles prior to or after traveling in Company vehicles was not *de minimis*;

j) That Defendants violated the Fair Labor Standards Act by not including time spent loading and unloading vehicles prior to or after traveling in Company vehicles, as well as time spent riding in Company vehicles after having loaded or prior to unloading Company tools, equipment, materials, or tools as hours worked for minimum-wage and overtime purposes;

k) That in the event that Plaintiffs are entitled to an award of back pay because they were not paid for all hours worked, Plaintiffs must be awarded double damages for overtime violations under the Fair Labor Standards Acts and treble damages for minimum wage violations under the Ohio Constitution ;

l) That upon finding a violation of the Fair Labor Standards Act or the Ohio Constitution, or both, Plaintiffs shall be awarded their costs, including reasonable attorneys' fees;

m) That due to the finding of violations of the Fair Labor Standards Act or the Ohio Constitution, or both, Plaintiffs are entitled to an award of reasonable attorneys' fees, which the Court shall determine after the conclusion of this case;

n) That Defendants violated Article II, Section 34a of Ohio's Constitution by failing to provide Plaintiff Lacy promptly with all records he sought;

o) That pursuant to Article II, Section 34a of Ohio's Constitution, Plaintiff Lacy is entitled to an award of his costs, including reasonable attorneys' fees, in initiating this suit to obtain his wage-and-hour records; and

p) Any other issues that the Court deems summary judgment to be just and appropriate under the circumstances.

Respectfully submitted,

MANGANO LAW OFFICES CO., L.P.A.

_____s/Joseph J. Guarino III_____
Basil W. Mangano (0066827)
*Joseph J. Guarino III (0079260)

2245 Warrensville Center Rd., Suite 213
Cleveland, Ohio 44118
T: (216) 397-5844
F: (216) 397-5845
bmangano@bmanganolaw.com
jguarino@bmanganolaw.com

And

Ryan K. Hymore (0080750)
10901 Reed Hartman Hwy., Ste. 207
Cincinnati, Ohio 45242
T: (513) 255-5888
F: (216) 397-5845
rkhymore@bmanganolaw.com

*Trial Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing paper will be served

by operation of the Court's CM/ECF system upon all parties of record in this matter on this

14th day of September 2012.

s/Joseph J. Guarino III
_____