IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CODY LACY, *et al.*,              :

          Plaintiffs,

            Case No. 3:11-cv-52

      v.                              :

            JUDGE WALTER H. RICE

REDDY ELECTRIC CO., *et al.*,

          Defendants.              :

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN
PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
(DOC. #70); OVERRULING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (DOC. #71); SUSTAINING DEFENDANTS' MOTION TO
DECERTIFY THE CLASS AS A COLLECTIVE ACTION (DOC. #72);
AND OVERRULING PLAINTIFFS' MOTION TO STRIKE AFFIDAVIT OF
LAURA WILSON (DOC. #73)

---

Plaintiff Cody Lacy filed suit, on behalf of himself and others similarly

situated, against his former employer, Reddy Electric Company, and its Vice

President, Jeffrey Eldridge.  Kyle Syx later joined as a party plaintiff.  The Second

Amended Collective Action Complaint alleges that Defendants violated the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206 and 207; Ohio's Minimum Wage

Act as set forth in Ohio Revised Code Chapter 4111; the Minimum Wage

Amendment to Ohio's Constitution (Art. II, §34a); and Ohio's Prompt Pay Act,

Ohio Revised Code § 4113.15(A).

This matter is currently before the Court on: (1) Plaintiffs' Motion for Partial Summary Judgment (Doc. #70); (2) Defendants' Motion for Summary Judgment (Doc. #71); (3) Defendants' Motion to Decertify the Class As a Collective Action (Doc. #72); and (4) Plaintiffs' Motion to Strike the Affidavit of Laura Wilson (Doc. #73).

## I.    Background and Procedural History

Defendant Reddy Electric Company ("Reddy") is an electrical contractor based in Xenia, Ohio. Defendant Jeffrey Eldridge is the Vice President of Reddy, and a part owner of the company. Eldridge Dep. at 7-8. After graduating from high school, Plaintiffs Cody Lacy and Kyle Syx were hired by Reddy as electrical helpers and electrical apprentices.

Lacy, who worked for Reddy from 2009 until 2010, was assigned to work at the Talawanda jobsite. Lacy Dep. at 9-10. Syx, who worked for Reddy from 2010 until 2011, was assigned first to the Arcanum Butler jobsite, and later to the Talawanda jobsite. Syx Dep. at 7. These jobsites were approximately one and one-half hours away from Plaintiffs' homes. Nevertheless, Reddy's company handbook states that "[a]n employee is expected to provide his/her own dependable transportation at his/her own expense to and from his job assignment." Ex. 1 to Lacy Dep., at 8.

Accordingly, for the first four-to-six weeks of their employment, Plaintiffs drove their own vehicles from their homes to the jobsite. Because they were

2

spending so much money on gas each day, Plaintiffs then asked Eldridge if they could instead meet at the Xenia office and travel with others in a company-owned vehicle to their respective job sites. Lacy Dep. at 10-11; Syx Dep. at 7-9. Eldridge agreed.

It is undisputed that Plaintiffs always had the option of driving their own vehicles from home to the jobsites. Lacy Dep. at 21; Syx Dep. at 20-21. Plaintiffs began meeting several coworkers at the Xenia office early each morning. Lacy would ride with Jaycob Burns in a small pickup truck. Syx rode with several other employees in a van and later in a car. The employees took turns driving the company vehicles to the jobsites.

Before they left Xenia, they would sometimes load tools, materials and equipment into the company vehicles. They were provided with a list of the materials that would be needed at the jobsites on that particular day. Lacy Dep. at 11-12; Syx Dep. at 9-11, 18-19. It typically took 5-15 minutes to load the necessary equipment. Lacy Dep. at 15; Syx Dep. at 9-10, 19.

Plaintiffs testified that they usually arrived at the jobsites about 6:45 a.m. They would typically clock in around 7:00 a.m., using their foreman's cell phone. After they arrived at the jobsites, but prior to clocking in, they would typically spend about 10 minutes unlocking the trailer and the gang boxes, and getting everything ready for the start of the workday. Lacy Dep. at 54, 63-64; Syx Dep.

at 65-67. Syx testified that this was "just expected of the apprentices. It always has been." Syx Dep. at 68.

At the end of the workday, after clocking out, Plaintiffs would sometimes transport materials back to the Xenia office. On those occasions, they would spend approximately 10 minutes unloading the company vehicles. Lacy Dep. at 28; Syx Dep. at 16-17. On one occasion, Syx transported material in his own vehicle from the jobsite back to the Xenia shop and spent 30 minutes unloading it. Syx Dep. at 12-16.

It is undisputed that Plaintiffs were not compensated for any of the time spent driving or riding in the company vehicles, or time spent loading, unloading or transporting tools and equipment. It is also undisputed that Defendants did not keep time records of Plaintiffs' activities prior to clocking in or after clocking out.

On March 2, 2011, Cody Lacy filed suit against Reddy and Eldridge, alleging that Defendants' failure to pay him for time spent transporting personnel, equipment and materials, loading and unloading the company vehicles, and performing other work-related activities prior to clocking in, violated federal and state minimum wage laws. Doc. #3. On June 6, 2011, Lacy filed a First Amended Collective Action Complaint, on behalf of himself and all those Reddy apprentice and journeyman electricians who worked in excess of 40 hours per week and were not compensated for overtime worked. Doc. #14. On June 16, 2011, Kyle Syx joined the suit as a party plaintiff. Doc. #17. On August 10,

4

2012, Plaintiffs filed a Second Amended Collective Action Complaint, adding allegations that Defendants had an illegal "time-rounding" policy that resulted in additional violations of federal and state law. Doc. #57.

## II.  Defendants' Motion to Decertify the Class as a Collective Action (Doc. #72)

On December 9, 2011, pursuant to 29 U.S.C. § 216(b), the Court conditionally certified this case as a collective action. Doc. #34. Opt-in notices were subsequently mailed to all potential class members. Although five other individuals submitted opt-in forms, they eventually withdrew them, leaving only Lacy and Syx as plaintiffs.

Defendants have now moved to decertify the collective action, arguing that, with just two plaintiffs, class treatment is no longer appropriate. Doc. #72. Plaintiffs have conceded that the collective action is moot. Doc. #77. Accordingly, the Court SUSTAINS Defendants' unopposed Motion to Decertify the Class as a Collective Action, Doc. #72.

## III.  Cross Motions for Summary Judgment (Docs. ## 70, 71)

On September 14, 2012, the parties filed cross-motions for summary judgment. Docs. ##70, 71. Defendants moved for summary judgment on all of Plaintiffs' claims. Plaintiffs acknowledge that certain facts are in dispute, but ask the Court to grant partial summary judgment in their favor on the following issues:

5

a) That each Plaintiff is an "employee" within the meaning of the Fair Labor Standards Act and the Ohio Constitution;

b) That each Defendant is an "employer" within the meaning of the Fair Labor Standards Act and the Ohio Constitution;

c) That due to Defendants failing to maintain adequate records, the presumption established under *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) shall be in effect throughout the remainder of these proceedings and that Plaintiffs' recollection of hours worked shall be presumed correct;

d) That Defendants utilize an unlawful time-rounding policy in violation of 29 C.F.R. § 785.48(b);

e) That under the Fair Labor Standards Act, any time that either Plaintiff spent operating Company motor vehicles while transporting employees, equipment, materials, or tools either from the Company's shop in Xenia, Ohio to a job site or from a job site to the Company's shop in Xenia, Ohio must be considered hours of work for purposes of determining whether Plaintiffs were compensated for all hours worked in each workweek;

f) That the Defendants violated the Fair Labor Standards Act by not including time spent operating Company motor vehicles while transporting employees, equipment, materials, or tools either from the Company's shop in Xenia, Ohio to a job site or from a job site to the Company's shop in Xenia, Ohio as compensable work and by not compensating Plaintiffs for those hours worked;

g) That the continuous workday rule governs whether or not Defendants were required to include hours spent riding in Company vehicles after having loaded or prior to unloading Company tools, equipment, materials, or tools as hours worked for minimum-wage and overtime purposes;

h) That the Court will utilize the aggregation doctrine while evaluating whether the time Plaintiffs spent loading and unloading vehicles prior to or after traveling in Company vehicles was *de minimis* so as to preclude application of the continuous workday rule;

i) That, in the aggregate, the time Plaintiffs spent loading and unloading vehicles prior to or after traveling in Company vehicles was not *de minimis*;

6

j) That Defendants violated the Fair Labor Standards Act by not including time spent loading and unloading vehicles prior to or after traveling in Company vehicles, as well as time spent riding in Company vehicles after having loaded or prior to unloading Company tools, equipment, materials, or tools as hours worked for minimum-wage and overtime purposes;

k) That in the event that Plaintiffs are entitled to an award of back pay because they were not paid for all hours worked, Plaintiffs must be awarded double damages for overtime violations under the Fair Labor Standards Act and treble damages for minimum wage violations under the Ohio Constitution;

l) That upon finding a violation of the Fair Labor Standards Act or the Ohio Constitution, or both, Plaintiffs shall be awarded their costs, including reasonable attorneys' fees;

m) That due to the finding of violations of the Fair Labor Standards Act or the Ohio Constitution, or both, Plaintiffs are entitled to an award of reasonable attorneys' fees, which the Court shall determine after the conclusion of this case;

n) That Defendants violated Article II, Section 34a of Ohio's Constitution by failing to provide Plaintiff Lacy promptly with all records he sought;

o) That pursuant to Article II, Section 34a of Ohio's Constitution, Plaintiff Lacy is entitled to an award of his costs, including reasonable attorneys' fees, in initiating this suit to obtain his wage-and-hour records; and

p) Any other issues that the Court deems summary judgment to be just and appropriate under the circumstances.

Doc. #70, at 67-68.

For the reasons set forth below, the Court OVERRULES Defendants' motion (Doc. #71), and OVERRULES IN PART AND SUSTAINS IN PART Plaintiffs' motion (Doc. #70).

A.     **Standard of Review**

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a

8

jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

9

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits." *Id.* (citations omitted).

    **B.**    **Fair Labor Standards Act, Ohio Minimum Fair Wage Standards Act, Ohio Constitutional Claims (Counts I-IV)**

        **1.**    **Relevant Law**

In the first four counts of the Second Amended Complaint, Plaintiffs assert numerous violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201, *et seq.*, Ohio's Minimum Fair Wage Standards Act, Ohio Revised Code Chapter 4111, and §34a of Article II of the Ohio Constitution.

Under the FLSA, employers must pay employees no less than minimum wage for each hour worked, 29 U.S.C. §206(a), and must pay time and one-half for each hour worked in excess of 40 hours in any workweek. 29 U.S.C. §207 (a)(1). Ohio law contains similar minimum wage and overtime provisions. *See* Ohio Rev. Code §§4111.02, 4111.03. Because the federal and state claims are

10

governed by the same standards, they may be analyzed together. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007).

Employers who violate the FLSA are liable for backpay, plus an additional equal amount as liquidated damages. 29 U.S.C. §216(b). If the Court finds, however, that the employer acted in good faith, it may choose to deny an award of liquidated damages. 29 U.S.C. §260. Under the minimum wage provisions of the Ohio Constitution, an employer is liable for "an additional two times the amount of the back wages." Ohio Const., Art. II, §34a. There is no good faith exception under Ohio law. Both the FLSA and the Ohio Constitution allow a prevailing plaintiff to recover reasonable attorney's fees and costs. 29 U.S.C. §216(b), Ohio Const., Art. II, §34a.

It appears to be undisputed, and the Court so finds, that Plaintiffs are non-exempt "employees" as that term is defined by the FLSA, and that Defendants Reddy Electric and Jeff Eldridge are "employers" subject to the requirements of the FLSA and Ohio's minimum wage and overtime laws. *See* 29 U.S.C. §203(d) and (e).

At issue in Counts I-IV is whether Plaintiffs are entitled to compensation for: time spent loading and unloading tools and equipment before clocking in or after clocking out; travel time between Xenia and the other jobsites; and time spent on *other* work-related activities at the jobsites prior to clocking in each day. Also at issue is whether Defendants' "time rounding" policy violates the FLSA, and

11

whether Reddy violated §34a of Article II of the Ohio Constitution by failing to provide requested employment records to Lacy in a timely manner.

> ### 2.   Loading, Unloading, Transporting Tools and Equipment, Travel Time

The Court first turns to the question of whether Plaintiffs must be compensated for the time spent loading and unloading equipment, materials, and tools, and the related question of whether Plaintiffs must be compensated for their travel time between Xenia and their assigned jobsites.

The FLSA does not define the terms "work" or "workweek."  Nevertheless, under the Portal-to-Portal Act, employers need not compensate employees for time spent:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> (2) activities which are preliminary to or postliminary to said principal activity or activities,

> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).

The following language was added to the Portal-to-Portal Act by the Employee Commuting Flexibility Act of 1996 ("ECFA"):

> For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which

12

are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

29 U.S.C. § 254(a).

Defendants argue that because the company vehicles were provided pursuant to an agreement between the parties, and because the travel was within Reddy's "normal commuting area," Plaintiffs need not be compensated for travel time or for any activities incidental to the use of the company vehicles, including loading and unloading equipment and tools.

Defendants' reliance on ECFA, however, is misplaced. That statute's legislative history indicates that it is meant to provide "clarification regarding the use of an employer-provided vehicle *for travel from an employee's home to the first work location at the start of the workday and from the last work location to the employee's home at the end of the workday*." H.R. Rep. No. 104-585 (1996) (emphasis added). ECFA does not apply to the situation presented here, where employees meet at the employer's headquarters and then use company vehicles to drive to and from the job sites. *See Herman v. Rich Kramer Const., Inc.*, No. 97-4308WMS, 1998 WL 664622, at *2 (8th Cir. Sept. 21, 1998) ("the ECFA did not apply because Kramer's foremen were not using the company trucks to commute

13

between home and work, but to drive between work and job sites"). This language therefore need not be considered in the analysis.

The threshold issue here concerns the definition of a "principal activity." According to Eldridge, the "principal activity" that Plaintiffs were hired to perform was working at the assigned jobsites. Eldridge Aff. ¶3. Defendants maintain that, under the Portal-to-Portal Act, Plaintiffs need not be compensated for time spent traveling to and from those jobsites in the company vehicles. Defendants further maintain that Plaintiffs are not entitled to compensation for time spent loading and unloading the company vehicles, since those activities are merely "preliminary to or postliminary to" the principal activity.

Plaintiffs, on the other hand, maintain that loading, unloading, and transporting necessary equipment, materials and tools are themselves "principal activities." The Supreme Court has held that "any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity'" and is, therefore, compensable. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005). In deciding whether an activity is a principal activity, "[w]hat is important is that such work is necessary to the business and is performed by the employees, primarily for the benefit of the employer, in the ordinary course of that business." *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 401 (5th Cir. 1976). "Principal activities" include "any work of consequence

14

performed for an employer, no matter when the work is performed." *Id.* at
398.

If the loading and unloading of the company vehicles constitute "principal
activities," these activities could define "the outer limits of the workday." *IBP*,
546 U.S. at 33-35. Under the "continuous workday" rule, Plaintiffs would be
entitled to compensation for all time in between. *Id.* at 37. Department of Labor
regulations provide that "[p]eriods of time between the commencement of the
employee's first principal activity and the completion of his last principal activity on
any workday must be included in the computation of hours worked." 29 C.F.R.
§790.6(a). Those regulations further define the "workday" as "the period between
the commencement and completion on the same workday of an employee's
principal activity or activities," including "all time within that period whether or not
the employee engages in work throughout all of that period." 29 C.F.R. §
790.6(b). In this respect, the "continuous workday" rule can operate to
transform non-compensable time, such as travel time, into compensable time.

One critical exception applies. If the time spent on the activities at issue is
*de minimis*, then the time is not compensable even if the activities are integral and
indispensable to the job the employee was hired to perform. *Rutti v. Lojack Corp.,
Inc.*, 596 F.3d 1046, 1057 (9th Cir. 2010). In addition, if the time spent on the
principal activity is *de minimis*, the "continuous workday" rule is not triggered.
*Singh v. City of New York*, 524 F.3d 361, 371 n.8 (2d Cir. 2008).

15

In determining whether a principal activity is *de minimis*, courts consider: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Rutti*, 596 F.3d at 1057 (quoting *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984)). In *Lindow*, the court noted that, although there is no bright line rule, generally "daily periods of approximately ten minutes" are considered *de minimis*. 738 F.2d at 1062.

With these general principles in mind, the Court turns to the facts at issue here. The Court starts with the undisputed fact that Defendants never *required* Plaintiffs to report to the Xenia site, or to ride to the jobsites in the company vehicles. According to Eldridge, Plaintiffs were not hired or needed to drive company vehicles or to transport supplies. Eldridge Aff. ¶3. Rather, at Plaintiffs' request, Eldridge allowed them to ride in the company vehicles so that Plaintiffs could save money on gas. Employees need not be compensated for activities undertaken for their own convenience, particularly when not required by the employer. *Dunlop*, 527 F.2d at 398. Defendants argue that Eldridge's generosity should not now result in a windfall to Plaintiffs.

But the fact that Plaintiffs were not required to report to the Xenia site, to travel in company vehicles, or to transport supplies and equipment, is not dispositive. If they engaged in a "principal activity" before or after their scheduled shift, with the knowledge and approval of Defendants, they may be entitled to

16

appropriate compensation, so long as those activities were not *de minimis*. "Work not requested but suffered or permitted is work time." 29 C.F.R. § 785.11. If Defendants knew that Plaintiffs were working, and accepted the benefits, compensation is required. *See Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (citing 29 C.F.R. § 785.13)).

The case of *Reich v. Brenaman Electrical Service*, No. Civ.A 95-CV-3737, 1997 WL 164235 (E.D. Pa. March 28, 1997), is instructive in this regard. There, as in this case, an electrical contractor gave its employees the option of driving their personal vehicles from home directly to the jobsite, or meeting at the shop to ride to the jobsite in the supply truck. The contractor knew that employees who chose to ride in the company vehicle often helped load the truck in the morning and unload it in the afternoon. The court noted that "[t]he fact that the employees voluntarily came to the shop for a ride does not mean Defendants are not required to pay them for working once they arrived. The question is not whether the work was voluntary, but whether the employee actually performed work with the knowledge and approval of the employer." *Id.* at *3.

In this case, Lacy testified that, at the beginning of the day, he and Jaycob Burns often loaded pipe, conduit, couplings, gang boxes, anchor bolts, concrete blankets, or other material that was needed that day at the Talawanda jobsite. Lacy Dep. at 15-16. Syx testified that he loaded tools, mud rings, wire, and boxes of material before going to the Arcanum jobsite. Syx Dep. at 9-10. When he was

17

working at the Talawanda jobsite, Syx would load devices, boxes, basic rough-in materials, and tools. *Id.* at 17-20. Syx stated that these items were needed to construct buildings at the jobsites, and if he did not transport them, someone else would have to do it. Syx Aff. at ¶14. At the end of the day, Plaintiffs would take broken tools, empty spools of wire and other trash from the jobsites back to Xenia and unload them. Lacy Dep. at 17-18; Syx Dep. at 15.

Notably, Defendants have presented no evidence concerning who would have been responsible for loading and unloading this equipment or transporting it to the jobsites if Plaintiffs had not done it. Nor have they presented any evidence indicating that these tools, equipment and materials were not needed at the jobsites.

Loading and unloading the company vehicles was done primarily for the benefit of the employer, and was integrally related to Reddy's business. Without these materials, tools and equipment, Reddy would not have been able to complete its work at the various jobsites. Under these circumstances, the Court finds, as a matter of law, that loading and unloading the company vehicles was a principal activity. *See Reich*, 1997 WL 164235, at **5-6 (holding that loading and unloading company vehicles was a principal activity where the supplies and equipment were necessary to fulfill tasks at the jobsite); *Herman*, 1998 WL 664622, at *2 (holding that time spent loading and unloading trucks benefited employer and was, therefore, compensable under the FLSA).

18

On those days that Plaintiffs transported necessary tools, equipment and materials, they may also be entitled to compensation for time spent driving the company vehicles between Xenia and the jobsites. *See DA&S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552, 555 (10th Cir. 1958) (holding that transporting necessary equipment is an integral and indispensable part of the principal activity and is therefore compensable); *Reich*, 1997 WL 164235, at *5 ("Had all employees driven straight from home to the job site every day, with no one driving the trucks and equipment to the job sites, the employees could not have fulfilled their tasks at the site."); *Herman*, 1998 WL 664622, at *2 ("driving to job sites was compensable as a principal activity because Kramer could not have constructed buildings without the tools, supplies, and employees transported by foremen.").

As previously noted, Plaintiffs took turns driving the company vehicles. On those days that they helped with loading or unloading, but simply rode as *passengers* in the company vehicle, their travel time may nevertheless be compensable under the "continuous workday" rule. As the court explained in *O'Brien v. Encotech Constr.*, No. 00-CV-1133, 2004 WL 609798, at *5 (N.D. Ill. March 23, 2004), on any day the employee helped load necessary equipment at the company's headquarters, the travel from there to the job site was compensable. Likewise, on any day the employee helped unload equipment at the

19

end of the day, the travel from the last jobsite to the headquarters was compensable.

Had Defendants required Plaintiffs to load and unload the company vehicles and transport tools, materials and equipment, there is no doubt that they would have been required to compensate Plaintiffs for these principal activities, so long as the time was not *de minimis*. In this case, however, because Defendants did not require Plaintiffs to do this work, the next question is whether Plaintiffs engaged in these activities with Defendants' knowledge and approval. As noted earlier, if Defendants knew that Plaintiffs were working before or after their scheduled shift, and accepted the benefits, compensation is required. *Kellar*, 664 F.3d at 177.

Eldridge admitted at his deposition that it was likely that Lacy helped Burns load the truck in the mornings because "that was something that Jaycob had been doing." Eldridge Dep. at 51. When Lacy was asked how he knew what materials and equipment needed to be loaded each day, he testified that sometimes the material would have a job number taped to it. Other times, the foremen or crew leaders told them what to bring with them. Lacy Dep. at 15-16, 26. Eldridge conceded that the crew leaders may have told them what needed to be transported each day. Eldridge Dep. at 52.

Syx also testified that, like Lacy, he was typically given a list of what needed to be taken to the jobsite each day. Syx Dep. at 11. Eldridge, however, expressed doubt that Syx transported materials and tools in the passenger van

20

since these things were locked up and, to the best of his knowledge, none of the employees riding with Syx had a key.  Eldridge Dep. at 52-53.

There does not appear to be any evidence in the record that Eldridge knew that Plaintiffs were transporting tools, equipment and material from the jobsite back to Xenia at the end of the day.  Nevertheless, if the crew leaders directed Plaintiffs to do this, it is possible that their knowledge could be imputed to the company.  In the Court's view, genuine issues of material fact preclude summary judgment on the question of whether Plaintiffs loaded and unloaded the company vehicles with Defendants' knowledge and approval.

Likewise, genuine issues of material fact preclude summary judgment on the question of whether Defendants knew that Plaintiffs were driving the company vehicles, loaded with necessary tools and equipment, to and from the jobsites. Lacy testified that he drove the pickup truck to and from the jobsite 95% of the time.  Lacy Dep. at 16.  Eldridge testified that he believed Burns was the primary driver, but he really did not know for sure.  Eldridge Dep. at 48.  Syx testified that he drove the passenger van at least once a week, sometimes two or three times. Syx Dep. at 13.  Eldridge testified that he believed that Doug Brooks was the primary driver of the passenger van, but he knew that Syx drove occasionally because he heard from others that Syx was a terrible driver.  Eldridge Dep. at 48, 51.

21

Based on the evidence presented, a reasonable jury could find that Defendants knew that Plaintiffs were helping to load and unload the company vehicles before and after their assigned shifts, and sometimes drove those vehicles to and from the jobsites.

But even if Plaintiffs were performing principal activities before and after their scheduled shift, with Defendants' knowledge and approval, they are not entitled to compensation if the time spent on these activities was *de minimis*. Again, genuine issues of material fact exist on this issue. As noted earlier, in determining whether the time is *de minimis*, the Court must consider: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Rutti*, 596 F.3d at 1057.

As to the first factor, Eldridge admitted at his deposition that there was a phone available at the Xenia shop that the employees could have used to clock in and out to record the time spent loading and unloading. Eldridge Dep. at 21-23. Therefore, it appears that it would not have been extremely difficult to record the additional time. As to the second and third factors, the parties admit that there is conflicting testimony about how often Plaintiffs loaded and unloaded company vehicles, how much time they spent on those tasks, and how often they drove the company vehicles to and from the jobsites.

22

According to Lacy, "close to ninety-five percent of the time," he and Jaycob Burns would load equipment onto the truck prior to leaving for the jobsite, and it typically took them about 10 minutes to do so. Lacy Dep. at 12, 15-16, 26. Eldridge did not deny that Lacy and Burns may have spent 10 minutes loading the truck. Eldridge Dep. at 52-53. Lacy also testified that 80-85% of the time, they would haul materials back to Xenia at the end of the day, and typically spent about 10 minutes unloading the truck. Lacy Dep. at 17-18, 28.

Jaycob Burns, however, submitted an affidavit stating that he and Lacy never loaded and hauled supplies more than once a week. Burns typically loaded the supplies for the following day after they returned to the Xenia shop in the afternoon. Burns stated that Lacy seldom stayed around long enough to help, and on the very few occasions he did, he never spent more than ten minutes loading supplies. Burns Aff. ¶¶ 4-5. Although Lacy testified that he drove to and from the jobsite 95% of the time, Lacy Dep. at 16, Jaycob Burns stated that Lacy usually drove in the morning, but Burns drove in the afternoon, Burns Aff. ¶3.

Syx testified that when he worked at the Arcanum jobsite, they would load materials and equipment into the van "maybe once a week," and this usually took 5-15 minutes. Syx Dep. at 9-11. As previously noted, Eldridge has questioned how this was possible since, to the best of his knowledge, none of the employees riding with Syx had a key to the Xenia shop. Eldridge Dep. at 52-53. According to Syx, about once every two weeks, they would transport material from the

23

jobsite back to Xenia at the end of the day. On those occasions, he would spend 10 minutes, at the most, unloading the van. Syx Dep. at 15-17.[1]

When Syx first started working at the Talawanda jobsite, they would spend 10-15 minutes "once or twice a week" loading supplies in the van. Once he began commuting in a company car instead of the van, they no longer took materials, but once or twice a week, they would load and transport tools to the jobsite. *Id.* at 17-20. Although Syx testified that he drove the van 1-3 times each week, Syx Dep. at 13, Eldridge said that Syx's coworkers "didn't want him driving" and "did everything they could to avoid the situation," Eldridge Dep. at 51.

Although Plaintiffs are entitled to aggregate the time spent on these activities, a jury will have to make factual findings concerning how often Plaintiffs loaded and unloaded the vehicles and how much time this took, before it can be determined if the time was *de minimis*. Notably, Plaintiffs are entitled to compensation for time spent *driving* the company vehicles only on those occasions they were actually hauling supplies and equipment. The frequency with which this occurred has yet to be determined. These factual disputes also preclude summary judgment on the question of whether travel time as a *passenger* in the company

---

[1] On one occasion, however, Syx took scrap material in his *personal* vehicle back to the Xenia shop and spent about 30 minutes unloading it. Syx Dep. at 12-13, 15-16. Foreman Tom Wicker concedes that Syx did this at his request, but says that, in return, Syx was given paid time off that same Friday. Wicker Aff. ¶5. Syx, on the other hand, denies being compensated for this work. Syx Dep. at 16.

vehicles is compensable under the "continuous workday" rule, since Plaintiffs are entitled to compensation only on those days they actually helped load or unload equipment.

As previously noted, it is undisputed that Defendants did not keep track of the time spent loading and unloading company vehicles, or the time spent driving to and from the jobsites. Accordingly, at trial, Plaintiffs need not present evidence of the "precise extent of uncompensated work." Rather, they satisfy their burden by proving that they

> in fact performed work for which [they were] improperly compensated and . . . produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).

### 3.    Other Work Prior to Clocking In

The next issue is whether Plaintiffs must be compensated for work performed after they arrived at the jobsites but before they clocked in. Again, genuine issues of material fact preclude summary judgment on this claim.

Plaintiffs testified that they usually arrived at the jobsites about 6:45-6:50 a.m. They clocked in at 7:00 a.m. Once they arrived at the jobsites, but prior to clocking in, they would typically spend about 10 minutes unlocking the trailer and

25

the gang boxes, setting up ladders, and getting everything ready for the start of the workday.[2] Lacy Dep. at 52-54, 63; Syx Dep. at 65-67. Syx testified that this was expected of the apprentices. Syx Dep. at 68.

In the Court's view, there is some question as to whether this work constituted a principal activity, integral and indispensable to the work that Plaintiffs were hired to do, or whether it was merely preliminary to the principal activity. Moreover, the parties disagree about whether Defendants knew that Plaintiffs engaged in this work activity prior to clocking in. According to Plaintiffs, their foremen knew that they were performing these tasks prior to clocking in, and never instructed them not to do so. Lacy Dep. at 52-53; Syx Dep. at 68-69. The foremen, however, deny that Plaintiffs engaged in any work activities prior to clocking in. Wicker Aff. ¶4; Baker Aff. ¶2. There is also a question of fact as to whether the time spent on these activities was *de minimis.* These factual disputes preclude summary judgment on this claim.

### 4. "Time Rounding" Policy

Plaintiffs also allege that, as a result of Defendants' "time rounding" policy, they were not paid for all hours worked. Plaintiffs maintain that Reddy's "time rounding" policy is illegal in two respects: (1) it rounds starting and stopping time up or down to the nearest half hour; and (2) regardless of what time an employee

---

[2] Defendants note that Lacy initially denied doing any work at the job site prior to clocking in. Lacy Dep. at 20.

clocks in, the employee is not paid for any work done prior to the scheduled start time of 7:00 a.m.

> Department of Labor regulations provide as follows:
>
> (b) "Rounding" practices. It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

29 C.F.R. § 785.48(b).

Reddy employees clock in and clock out on their foreman's cell phone through a time recording system called DataMAX. The accounting system takes the total reported hours worked each day, backs out a daily unpaid half-hour lunch period, and then rounds the net time forward or backward. Jordan Dep. at 20-22.

There is some confusion, however, about whether the time is rounded to the nearest 15 minutes or the nearest half hour. According to Cheryl Yankee, Reddy's Service/Safety Coordinator, time is rounded up or down to the nearest 15 minutes. Yankee Aff. ¶5. This is consistent with what Julie Jordan, Reddy's Controller, initially stated at her deposition. When pressed, however, Jordan acknowledged that on at least two occasions, it appeared that Lacy's reported time was rounded

27

down to the nearest 30 minutes instead of up to the nearest 15 minutes.[3] Jordan

Dep. at 86-89.

Plaintiffs argue that a system that rounds up or down to the nearest half

hour is unlawful on its face, because 29 C.F.R. § 785.48(b) refers to policies that

round time to the "nearest 5 minutes, or to the nearest one-tenth or quarter of an

hour." But in an Opinion Letter, the United States Department of Labor, Wage and

Hour Division, addressed this precise issue, and concluded:

> it is our opinion that a practice of rounding to the nearest one-half
> hour, as you stated, would not be inconsistent with the practices
> outlined in section 785.48(b) of Regulations, Part 785. Our
> acceptance of this rounding practice rests on the assumption that the
> rounding averages out so that these [employees] are fully
> compensated for all the time they actually work.

Dep't of Labor, November 7, 1994 Opinion Letter, 1994 WL 1004879, at *1. In

other words, regardless of whether the system rounds time to the nearest 15

minutes or the nearest 30 minutes, the ultimate question is whether it results in

systematic underpayment of employees.

Jordan admitted at her deposition that, for three separate workweeks, Lacy

was paid for only 40 hours of work even though he had actually worked 40.9,

41.06, and 41.33 hours. Jordan Dep. at 97-99. In the Court's view, the evidence

---

[3] On November 10, 2009, Lacy's clocked hours were 3.82. Rather than being
rounded up to 4.0, this was rounded down to 3.5. Likewise, on December 2,
2009, Lacy's clocked hours were 3.8, but this was rounded down to 3.5. Ex. 9 to
Jordan Dep.

28

presented is sufficient to create a genuine issue of material fact regarding whether the time rounding policy resulted in systematic underpayment of employees.  The Court therefore finds that summary judgment is inappropriate on this portion of Plaintiffs' claim.

Plaintiffs also allege that Defendants' rounding policy is facially defective because it always rounds up to the scheduled start time, no matter what time employees log in.  Yankee Aff. ¶5.  Assuming that the employees engaged in any work prior to the scheduled start time, this policy, of course, exclusively benefits Defendants.  As 29 C.F.R. § 785.48(b) indicates, rounding policies are acceptable so long as they are used in a manner that will not result, over a period of time, in a failure to properly compensate employees for all time actually worked.  A policy that always rounds up to the scheduled start time, regardless of when an employee logs in, fails in that respect.  The Court therefore agrees that this portion of the rounding policy is facially defective as a matter of law.

In order to recover damages under this theory, however, Plaintiffs must still present evidence that they clocked in and engaged in principal activities before their scheduled start time, but were not compensated.  Defendants argue that any period of time rounded away was *de minimis* and is therefore not compensable. Plaintiffs correctly note that, however, that there is no *de minimis* exception to excuse non-payment in connection with a rounding policy.  *Eddings v. Health Net, Inc.*, No. CV 10-1744-JST, 2012 WL 994617, at *5 (C.D. Cal. March 23, 2012)

29

(refusing to apply the *de minimis* exception to a rounding policy, and noting that "[t]he *de minimis* exception is not a broad rule granting employ[ers] some number of free minutes of labor per day.").

Finally, Defendants argue that, even assuming that the time rounding policies deprived Plaintiffs of compensation to which they were otherwise entitled, any resulting underpayment is offset by the fact that employees were gratuitously paid for a 15-minute break each day. It is undisputed that Plaintiffs typically worked from 7:00 a.m. until 3:30 p.m. each day. In addition to a 30-minute unpaid lunch break, they were given a 15-minute paid break. Ex. 1 to Jordan Dep. at 8. The foremen allowed them to combine the two into one 45-minute lunch period, and during this time Plaintiffs were completely relieved of their duties. Syx Aff. ¶¶5-10.

Defendants note that employees must be paid for stand-alone breaks of 5-20 minutes, 29 C.F.R. § 785.18, but not for meal periods, 29 C.F.R. § 785.19. Defendants maintain that where, as here, the employees choose to combine the two, in effect extending their meal period, the employer is no longer obligated to pay the employee for the 15-minute break. According to Defendants, because Plaintiffs took 45 minutes for lunch, but were docked for only 30 minutes, they were, in essence, overpaid by 15 minutes each day. Yankee Aff. ¶¶2-3. By Defendants' calculations, Lacy was overpaid a total of 24.37 hours, and Syx was

30

overpaid a total of 63.28 hours. *Id.* at ¶8. It is undisputed that Plaintiffs were

compensated for the 15-minute break at their regular rate of pay.

Notably, Defendants offer no authority to support their argument that by

combining an unpaid lunch period with a paid break, the employee, in essence,

loses the right to be compensated for the break. But even assuming that this is a

correct statement of the law, the FLSA does not necessarily permit an offset under

the circumstances presented here.

Defendants cite to several cases in which employers were permitted to

offset paid meal time against the unpaid pre-shift and post-shift activities of law

enforcement officers. *See Barefield v. Village of Winnetka*, 81 F.3d 704 (7th Cir.

1996); *Avery v. City of Talladega*, 24 F.3d 1337 (11th Cir. 1994); *Cloutier v. City

of Phenix City*, 834 F. Supp. 366 (M.D. Ala. 1993). If the FLSA's overtime

requirements have not yet been triggered, such an offset may well be available. If,

however, the employee has worked more than forty hours in any workweek,

thereby triggering the FLSA's overtime requirements, the availability of offsets is

narrowly prescribed by statute.

"Where a credit is allowed, the statute says so. Section 207 [of the FLSA]

provides that employers may credit premium payments for work outside standard

work periods against statutorily required overtime pay." *Wheeler v. Hampton

Twp.*, 399 F.3d 238, 245 (3d Cir. 2005) (citing 29 U.S.C. § 207(h)). Only the

three types of premium payments set forth in 29 U.S.C. § 207(e)(5)(6) and (7), however, may be applied as an offset.

Where, as here, extra compensation is paid at a *regular* rate rather than a *premium* rate, no offset may be applied.  *See Johnson v. D.M. Rothman Co., Inc.*, 861 F. Supp.2d 326, 334 (S.D.N.Y. 2012) (holding that employer cannot credit "regular wages mistakenly paid, since that is not 'premium' compensation paid to work in excess of regular hours."); *O'Brien v. Town of Agawam*, 508 F. Supp.2d 142, 146 (D. Mass. 2007) (holding that compensation paid at regular rate cannot be used to offset FLSA liability); *Rudy v. City of Lowell*, 777 F. Supp.2d 255, 262 (D. Mass. 2011) ("only the premium portions of the extra payments . . . may be used to offset the City's overtime liability.")

Until a jury determines how much time Plaintiffs spent on pre-shift and post-shift activities, and determines whether that time is compensable under federal and state law, the Court cannot determine whether Defendants might be entitled to any offset in this case.  Summary judgment on this issue is therefore inappropriate.

### 5.  Records Request

On January 7, 2011, prior to filing this lawsuit, Lacy's counsel requested copies of Lacy's personnel file, earnings and deductions reports, employee handbooks, records of his hours worked, job descriptions, paystubs and travel time policies.  Lacy Aff. ¶4.  He did not receive the requested documents until

November 9, 2011, after the suit was filed, when Defendants responded to Plaintiffs' request for production of documents. *Id.* at ¶13.

In the Third Claim for Relief, Plaintiffs allege that Defendants' failure to produce the requested records in a timely manner violates Ohio Revised Code §4111.14(G) and Article 2, Section 34a of the Ohio Constitution. Sec. Am. Compl. ¶¶30-32. Those statutory and constitutional provisions require employers to keep wage and hour records and furnish them, without charge, to an employee within 30 business days of the request, unless the parties agree to a different timeframe or the deadline would cause a hardship to the employer. If an employee is forced to file suit to obtain the requested records, the employer must pay reasonable attorneys' fees and costs. Ohio Const., Art. II, §34a.

### a. Plaintiffs' Motion to Strike Laura Wilson's Affidavit (Doc. #73)

In their Motion for Summary Judgment, Defendants noted that since all of the requested records had been produced in discovery, it was not clear whether Plaintiffs were seeking any further relief for the alleged violation. According to Defendants, any request for equitable relief was moot, and Ohio law does not provide for monetary damages in this situation. Doc. #71, at 3 n.3.

Defendants submitted an affidavit from Attorney Laura Wilson, who previously represented them in this litigation. Ex. B to Defs.' Mot. Summ. J. She avers that after she received the January 7, 2011, document request, she spoke to

33

Lacy's attorney on several occasions before this lawsuit was filed, and they all agreed to hold the document request in abeyance pending settlement discussions. Wilson Aff. ¶¶4-5.

Plaintiffs have moved to strike Wilson's affidavit. Doc. #73. They argue that because Defendants did not move for summary judgment on the constitutional claim, the affidavit must be considered irrelevant and improper extraneous material. They further argue that it should be excluded because Defendants did not disclose Wilson as a potential witness pursuant to Federal Rule of Civil Procedure 26.

The Court rejects both of these arguments. Defendants expressly argued that they were entitled to summary judgment on *all* of Plaintiffs' claims, and discussed why they believed this particular claim was moot. Wilson's affidavit is clearly relevant in this respect. Moreover, Plaintiffs had adequate notice that, if they intended to pursue this claim, Wilson would likely be a witness. Information about Wilson's discussions with Plaintiffs' counsel was included in Defendants' response to Plaintiffs' discovery requests, and was discussed in Julie Jordan's deposition. Ex. 21 to Jordan Dep.; Jordan Dep. at 139-43. Because Defendants' failure to disclose Wilson as a potential witness was harmless, they are not foreclosed from using her affidavit in support of their motion. *See* Fed. R. Civ. P.

37(c)(1).[4]  For these reasons, the Court OVERRULES Plaintiffs' Motion to Strike

Laura Wilson's Affidavit.  Doc. #73.

<b>b.    Analysis</b>

In response to Wilson's affidavit, Lacy submitted an affidavit in which he

denies that he or his attorneys agreed to any stay of the 30-day deadline for Reddy

to respond to his records request.  Lacy Aff. ¶8.  Defendants note, however, that

while Lacy may not have personally agreed to a stay, he has no personal

knowledge of whether his attorneys so agreed.  Because it is not clear whether the

parties agreed to extend the 30-day deadline, the Court finds that genuine issues

of material fact preclude summary judgment on this claim.

<b>6.    Liquidated Damages</b>

Finally, Plaintiffs ask the Court to find that they are entitled to liquidated

damages on the FLSA claims.  As noted earlier, the Court may determine that

liquidated damages are not warranted only "if the employer shows to the

satisfaction of the court that the act or omission giving rise to such action was in

good faith and that he had reasonable grounds for believing that his act or

omission was not a violation of the Fair Labor Standards Act."  29 U.S.C. § 260.

---

[4] Defendants also note, correctly, that Plaintiffs failed to comply with S.D. Ohio
Local Rule 37.1, which requires them to attempt to resolve the discovery dispute
informally before bringing it to the Court's attention.

Plaintiffs maintain that Defendants have no evidence indicating that they took any steps to determine the legality of the compensation practices at issue in this case. Defendants, on the other hand, argue that there is no evidence that they acted in bad faith. In light of the numerous remaining factual disputes surrounding Plaintiffs' FLSA claims, the Court finds that it is premature to decide whether liquidated damages should be awarded. Plaintiffs' request for summary judgment on this issue is, therefore, overruled.

C. **Prompt Pay Act Claim (Count V)**

In the Fifth Claim for Relief, Plaintiffs allege that Reddy failed to pay all wages due and owing within the time specified under Ohio Revised Code § 4113.15(A). Since the viability of this claim hinges on the viability of the minimum wage and overtime claims set forth in Counts I-IV, summary judgment on this claim is inappropriate at this time.

IV. **Conclusion**

For the reasons set forth above, the Court SUSTAINS Defendants' unopposed Motion to Decertify the Class as a Collective Action (Doc. #72), and OVERRULES Plaintiffs' Motion to Strike Laura Wilson's Affidavit (Doc. #73). Defendants' Motion for Summary Judgment (Doc. #71) is OVERRULED. Plaintiffs' Motion for Partial Summary Judgment (Doc. #70) is SUSTAINED IN PART and OVERRULED IN PART.

The Court SUSTAINS Plaintiffs' Motion for Partial Summary Judgment with respect to the following five issues:

a) Each Plaintiff is an "employee" within the meaning of the Fair Labor Standards Act and the Ohio Constitution;

b) Each Defendant is an "employer" within the meaning of the Fair Labor Standards Act and the Ohio Constitution;

c) Due to Defendants failing to maintain adequate records, the presumption established under *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) shall be in effect throughout the remainder of these proceedings and that Plaintiffs' recollection of hours worked shall be presumed correct;

d) To the extent that Defendants' time-rounding policy always rounds up to the scheduled start time regardless of when the employees clock in, that policy is facially defective; and

e) The aggregation doctrine applies in evaluating whether the time Plaintiffs spent loading and unloading vehicles prior to or after traveling in Company vehicles was *de minimis* so as to preclude application of the continuous workday rule.

Genuine issues of material fact preclude summary judgment on the remainder of the issues on which Plaintiffs sought partial summary judgment.  All claims asserted remain pending for trial.

Date: July 11, 2013

WALTER H. RICE
UNITED STATES DISTRICT JUDGE

37